**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ALEKSEY RUDERMAN, JASON CLARKE, BASARU ASOLO, JAMES FORERO, and CHRIS POCKNELL, on behalf of themselves and all others similarly situated, | ) | Case No. 22-CV-50115 |
| Plaintiffs, | ) | Judge Iain D. Johnston |
| v. | ) | Magistrate Judge Michael F. Iasparro |
| MCHENRY COUNTY, MCHENRY COUNTY SHERIFF'S OFFICE, BILL PRIM, KEITH NYGREN, MICHAEL CLESCERI, DANIEL SITKIE, DAVID DEVANE, and DANIEL SEDLOCK, | ) | |
| Defendants/Third Party Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Third Party Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

Elizabeth N. Mazur
Charles D. Wysong
Kate Schwartz
Margaret E. Truesdale
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com
cwysong@hsplegal.com
kschwartz@hsplegal.com
mtruesdale@hsplegal.com

# TABLE OF CONTENTS


INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

I. The McHenry County Jail Housed Civil Immigration Detainees for ICE. ........ 2

II. The McHenry County Sheriff's Office Implemented a Uniform Policy and Practice of Coercing Civil Immigration Detainees to Clean the Common Areas of the Jail. ........ 2

A. A Uniform Jail Policy Subjected All Putative Class Members to the Same Requirement to Clean the Jail's Common Areas. ........ 2

B. Defendants Systematically Communicated the Same Threat of Punishment to All Putative Class Members Through the Jail's ICE Detainee Handbook. ........ 6

C. McHenry County Benefitted from Civil Immigration Detainees' Forced Janitorial Labor. ........ 10

LEGAL STANDARD ........ 11

ARGUMENT ........ 11

I. The Proposed Classes ........ 11

II. Plaintiffs Satisfy the Requirements of Rule 23(a). ........ 12

A. The Numerosity Requirement is Satisfied. ........ 12

B. Common Questions of Law and Fact Abound. ........ 12

1. The TVPA Class. ........ 13

2. The State Law Class. ........ 16

C. The Claims of the Class Representatives Are Typical of the Claims of the Members of the Putative Classes. ........ 18

D. Plaintiffs Will Adequately Protect the Interests of the Class. ........ 19

III. Plaintiffs Meet the Requirements of Rule 23(b)(3). ........ 20

A. Common Issues Predominate. ........ 20

B. Class Treatment Is the Superior Method of Adjudication. ........................ 23

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**


*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .......... 21

*Arreguin v. Sanchez*,
398 F. Supp. 3d 1314 (S.D. Ga. 2019) .......... 23

*Belvis v. Colamussi*,
No. CV 16-544 (JFB)(ARL), 2018 WL 3151698 (E.D.N.Y. Feb. 20, 2018) .......... 23

*Bolden v. Pesavento*,
158 F.4th 879 (7th Cir. 2025) .......... 21

*Phillips v. Asset Acceptance, LLC*,
736 F.3d 1076 (7th Cir. 2013) .......... 20

*Chavez v. Don Stoltzner Mason Contractor, Inc.*,
272 F.R.D. 450 (N.D. Ill. 2011) .......... 12

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*,
797 F.3d 426 (7th Cir. 2015) .......... 13

*Clancy v. Salvation Army*,
No. 22 CV 1250, 2026 WL 837402 (N.D. Ill. Mar. 26, 2026) .......... 24

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) .......... 11

*De La Fuente v. Stokely-Van Camp, Inc.*,
713 F.2d 225 (7th Cir. 1983) .......... 18

*Francisco v. Susano*,
525 F. App'x 828 (10th Cir. 2013) .......... 22

*Gociman v. Loyola Univ. of Chicago*,
41 F.4th 873 (7th Cir. 2022) .......... 17

*Hatcher v. Hatcher*,
2020 IL App (3d) 180096, 158 N.E.3d 326 .......... 17

*Jacks v. DirectSat USA, LLC*,
118 F.4th 888 (7th Cir. 2024) .......... 24

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) .......... 18

*Leiva v. Clute*,
No. 4:19-CV-87-TLS-JPK, 2020 WL 8514822 (N.D. Ind. Dec. 16, 2020) ...21, 22, 23

*Menocal v. GEO Grp., Inc.*,
320 F.R.D. 258 (D. Colo. 2017) .......... 15

*Menocal v. GEO Grp., Inc.*,
882 F.3d 905 (10th Cir. 2018) ............................................................ 15, 18, 21

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ............................................................ 11, 21, 23, 24

*Novoa v. GEO Grp., Inc.*,
No. EDCV 17-2514 JGB (SHKX), 2019 WL 7195331 (C.D. Cal. Nov. 26, 2019)
............................................................................................................ 16

*Nwauzor v. Geo Grp., Inc.*,
3:17-cv-05769-RJB (W.D. Wash. Aug. 6, 2018) .............................................. 16

*Owino v. Corecivic, Inc.*,
60 F.4th 437 (9th Cir. 2022) ............................................................ 15, 21

*Palmer v. Combined Ins. Co. of Am.*,
217 F.R.D. 430 (N.D. Ill. 2003) ............................................................ 23

*Porter v. Pipefitters Ass'n Loc. Union 597*,
208 F. Supp. 3d 894 (N.D. Ill. 2016) ............................................................ 13

*Ross v. Jenkins*,
325 F. Supp. 3d 1141 (D. Kan. 2018) ............................................................ 22

*Shady Grove Orthopedic Associates, P.A., v. Allstate Ins. Co*.,
559 U.S. 393 (2010) ............................................................ 11

*Stavropoulos v. Hewlett-Packard Co.*,
No. 13 C 5084, 2014 WL 7190809 (N.D. Ill. Dec. 17, 2014) ............................ 22

*Svoboda v. Amazon.com Inc.*,
168 F.4th 956 (7th Cir. 2026) ............................................................ 21, 24

*Trotter v. Klincar,*
748 F.2d 1177 (7th Cir. 1984) ............................................................ 11

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................ 13, 14, 20

*Wang v. Gold Mantis Constr. Decoration (CNMI), LLC*,
705 F. Supp. 3d 1190 (D. N. Mar. I. 2021) ............................................................ 23

*West v. Butikofer*,
No. 19-CV-1039-CJW-KEM, 2020 WL 5245226 (N.D. Iowa Aug. 18, 2020) ... 23

*Yeend v. Akima Glob. Servs., LLC*,
No. 1:20-CV-01281 (AMN/PJE), 2025 WL 959968 (N.D.N.Y. Mar. 31, 2025). 16

**Statutes**

18 U.S.C. § 1589 ............................................................ 13, 15

18 U.S.C. § 1595 ............................................................ 12

720 ILCS 5/10-9 ............................................................ 17

740 ILCS 128/15 .......... 17

745 ILCS 10/8-101 .......... 12

**Other Authorities**

1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:28 (6th ed. 2026) .......... 18

2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:65 (6th ed. 2026) .......... 24

*NDS 2000: Voluntary Work Program*, ICE (Sept. 20, 2000) .......... 5

**Rules**

Fed. R. Civ. P. 23 .......... passim

## INTRODUCTION

For over a decade, McHenry County generated revenue for itself by housing civil immigration detainees in its local jail for U.S. Immigration and Customs Enforcement ("ICE") pursuant to a contract with the federal government. This case is about the McHenry County Sheriff's Office's uniform policy and practice of coercing these civil immigration detainees to perform unpaid janitorial labor in the jail's common areas by threatening them with discipline up to and including fifteen days in solitary confinement. By exploiting civil immigration detainees' forced and uncompensated labor, the Sheriff's Office minimized the cost of satisfying its obligation to maintain sanitary detention facilities and maximized the County's profits from its government contract. The County then relied on those profits to fund many aspects of county government—well beyond jail operational costs.

The named Plaintiffs and members of the classes they seek to represent were civilly detained at the McHenry County jail pursuant to the ICE contract. Plaintiffs allege that Defendants' forced janitorial labor policy violates the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, as well as its state law corollary, the Illinois Trafficking Victims Protection Act ("ITVPA"), 740 ILCS 128/15, and gives rise to claims under Illinois law for unjust enrichment. The central legal and factual questions in this case are suitable for class-wide resolution: Defendants' policy and practice is uniform, written, and undisputed. Plaintiffs assert that it violates the law, whereas Defendants assert that it does not. Either way, the answer is the same for every civil immigration detainee. Consequently, the rights of thousands of detained immigrants can be resolved in one fell swoop as part of a single, fair, and efficient proceeding. The Ninth and Tenth Circuits have already affirmed certification of similar classes of civil immigration detainees raising TVPA claims. In line with these precedents, this Court should certify the TVPA and State Law

Classes outlined below pursuant to Rule 23(a) and (b)(3).

## STATEMENT OF FACTS

### I. The McHenry County Jail Housed Civil Immigration Detainees for ICE.

Defendants are the McHenry County Sheriff's Office, McHenry County, and individuals who served as Sheriff and Chief of Administration for Corrections who operated the McHenry County Correctional Facility in Woodstock, Illinois (the "Jail"). Ex. 1 (Sheriff Prim Aff.) ¶ 2; Ex. 2 (Sheriff's Office ROG Responses) at ROG No. 11. During the entire proposed class period, McHenry County was engaged in a contract with the federal government to house ICE detainees who were awaiting a hearing on their immigration status or deportation. *See* Ex. 3 (2008 Intergovernmental Agreement) at MCC002107; Ex. 4 (2014 Intergovernmental Agreement) at MCC003022-24. Under this contract—sometimes called the "bed rental program"—the federal government paid McHenry County $95 per day for each civil immigration detainee housed at the Jail. Ex. 4 (2014 Intergovernmental Agreement), at MCC003022; Ex. 5 (Sheriff Nygren Dep.) at 122:21-127:3. The Jail routinely housed more than 240 civil immigration detainees on any given day. Ex. 1 (Sheriff Prim Aff.) ¶ 3.

### II. The McHenry County Sheriff's Office Implemented a Uniform Policy and Practice of Coercing Civil Immigration Detainees to Clean the Common Areas of the Jail.

The Sheriff's Office's written uniform policy and admitted practice was to compel civil immigration detainees to clean the common areas of the Jail without pay and under threat of discipline.

#### A. A Uniform Jail Policy Subjected All Putative Class Members to the Same Requirement to Clean the Jail's Common Areas.

The Sheriff's Office admits that, at all times relevant to this lawsuit, its Facility Housekeeping General Order accurately reflected its policy for civil immigration detainees, and it

required Jail staff to implement this policy. *See* Ex. 6 (Sheriff's Office RFA Answers) at RFA Nos. 21, 22, 25; *see also* Ex. 7 (Sheriff Prim Dep.) at 16:20-18:6, 20:17-21, 21:17-22:3, 29:9-21. Pursuant to the Housekeeping General Order, civil immigration detainees were "responsible for the general housekeeping of all common areas within each housing unit," including "All showers," "Dayroom restrooms," and "Dayroom common areas." Ex. 8 (Housekeeping General Order) at MCC000015. As outlined in the McHenry County Sheriff's Office's ICE Detainee Handbook, all sections of the Jail were locked down daily from 5:00 p.m. to 6:00 p.m., and at that time the civil immigration detainees housed in that section were required to clean the dayroom. *See* Ex. 9 (Handbook Rev. 2011) at MCC002130; Ex. 10 (Handbook Rev. 2017) at MCC002468; *see also* Ex. 11 (Chief Sedlock Dep.) at 56:11-57:10; Ex. 5 (Sheriff Nygren Dep.) at 47:9-15; Ex. 12 (Officer Hermie Dep.) at 52:15-53:7; Ex. 13 (Lt. Acevedo Dep.) at 37:16-38:2. The Housekeeping General Order mandated that correctional officers select civil immigration detainees to perform each day's common area cleaning "on a rotating basis based upon their cell assignment." Ex. 8 (Housekeeping General Order) at MCC000016; *see also* Ex. 14 (Northwest Herald Article quoting Sheriff's Office spokesman Byrnes); Ex. 11 (Chief Sedlock Dep.) at 78:21-22; Ex. 13 (Lt. Acevedo Dep.) at 29:22-30:24.

Every day the assigned cleaners were required to perform the following tasks, as set forth in the Housekeeping General Order: (a) "Collect all trash from all waste baskets throughout the housing unit," (b) "Clean all table tops in the dayroom," (c) "Sweep all floors throughout the pod," (d) "Mop all areas swept," (e) "Spot clean all windows," (f) "Wipe down all telephones/video visitation stations," (g) "Dust all furniture, shelves, etc.," (h) "Clean detainee/inmate showers," (i) "Clean dayroom restrooms," and (j) "Refill dispensers." Ex. 8 (Housekeeping General Order) at MCC000015; *see also* Ex. 6 (Sheriff's Office RFA Answers) at RFA Nos. 21, 22, 25; Ex. 15 (Chief

Sitkie Dep.) at 44:19-45:6; Ex. 11 (Chief Sedlock Dep.) at 74:19-75:1. Importantly, this janitorial labor was mandatory and unpaid. *See* Ex. 16 (Chicago Tribune Article quoting Chief Clesceri) ("The common dayroom cleanups are rotated daily by cells. Inmates and detainees are not paid for this function however."); Ex. 14 (Northwest Herald Article quoting Sheriff's Office spokesman Byrnes); Ex. 17 (Sheriff Prim RFA Answers), RFA Nos. 13-14, 16, 17-20, 24; Ex. 18 (Chief Clesceri RFA Answers), RFA No. 24; Ex. 19 (Detainee Ojowa Grievance); Ex. 20 (Detainee Rasho Grievance); Ex. 7 (Sheriff Prim Dep.) at 25:16-19. Detainee testimony corroborates that correctional officers executed this daily routine of selecting civil immigration detainees to clean their housing units' common areas per the Housekeeping General Order. Ex. 21 (Pl. Clarke Dep.) at 58:8-16, 69:5-11; Ex. 22 (Pl. Forero Dep.) at 39:24-40:21, 67:12-13; Ex. 23 (Pl. Pocknell Dep.) at 41:2-42:24; Ex. 24 (Pl. Ruderman Dep.) at 97:19-98:6; Ex. 25 (Detainee Rasho Decl.) ¶ 2; Ex. 26 (Detainee Rasho Dep.) at 22:15-20; Ex. 27 (Detainee Nuñez Ramirez Decl.) ¶ 2; Ex. 28 (Detainee Nuñez Ramirez Dep.) at 18:9-22; Ex. 29 (Detainee Rodriguez Soto Decl.) ¶ 3; Ex. 30 (Detainee Osorio Decl.) ¶ 7.

Pursuant to the Housekeeping General Order, the Jail's paid janitorial staff were only to clean areas of the Jail "where detainees/inmates are not permitted." Ex. 8 (Housekeeping General Order) at MCC000014. To keep clean the areas of the facility where civil immigration detainees were housed, Defendants relied on the detainees' unpaid forced labor. The Jail's third floor housed exclusively civil immigration detainees, and accordingly civil immigration detainees cleaned the sections on the third floor each day. Ex. 31 (Sheriff's Office Am. Answers to Ruderman ROGs) at ROG No. 18; Ex. 32 (Chief Clesceri Dep.) at 36:25-37:4. Each of the four large sections on the third floor measured 4,800 square feet and contained thirty-two double cells as well as a common area, which included a large dining area, four showers, a sink, a toilet, four telephones, and at least

two visitation stations. Ex. 33 (Third Floor Layout); Ex. 34 (Housing Unit Photos); Ex. 35 (Jail Specs). The four smaller sections measured between 500 and 950 square feet each, and their common areas contained 1 shower, 1 sink, 1 telephone, and 1 visitation station. Ex. 35 (Jail Specs). Unpaid and coerced detainees—not janitors—were required to clean these spaces every day.

Notably, Defendants' forced janitorial labor policy is in violation of ICE's detention standards. Per ICE's Performance-Based National Detention Standards ("PBNDS") and National Detention Standards ("NDS"), civil immigration detainees cannot be compelled to work, except for a short list of "personal housekeeping" tasks[1] to be performed in their immediate living area (*i.e.*, their cell). Ex. 36 (ICE PBNDS, § 5.8) at P000011[2] ("Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping."); *NDS 2000: Voluntary Work Program*, ICE, at 2, (Sept. 20, 2000), https://www.ice.gov/doclib/dro/detention-standards/pdf/work.pdf (aside from "personal housekeeping," all work assignments are voluntary). In spite of the clear requirements of ICE's detention standards, the McHenry County Sheriff's Office's policy and practice went far beyond requiring ICE detainees to perform personal housekeeping in their immediate living areas. Indeed, Defendants have admitted outright that they required civil immigration detainees to complete janitorial labor that extends beyond the personal housekeeping tasks identified in the PBNDS. Ex.

---

[1] "Personal housekeeping" means only maintaining one's immediate living area in a neat and orderly manner by (1) making one's bed daily, (2) stacking loose papers, (3) keeping the floor free of debris and dividers free of clutter, and (4) refraining from hanging or draping clothing, pictures, keepsakes, or other objects from beds, overhead light fixtures or other furniture. *See* Ex. 36 (ICE PBNDS, § 5.8) at P000012.

[2] Also available at https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

6 (Sheriff's Office RFA Answers) at RFA No. 27.[3]

### B. Defendants Systematically Communicated the Same Threat of Punishment to All Putative Class Members Through the Jail's ICE Detainee Handbook.

Defendants knowingly obtained compliance with the Sheriff's Office's forced janitorial labor policy by threatening each and every civil immigration detainee with discipline. *See* Ex. 37 (Chief Sitkie Email) (instructing staff to remind inmates of the threat of "15 DAYS OF SEG TIME" for not cleaning, stating "THAT SHOULD SOLVE THE REFUSAL PROBLEMS"). Under the Sheriff's Office's disciplinary policies, ICE detainees could be (and in fact were) subject to discipline for refusing orders to clean, including being placed on lockdown in their cell for up to three days and up to fifteen days in "disciplinary segregation" (*i.e.,* solitary confinement).[4]

According to the Sheriff's Office's ICE Detainee Handbook, "minor violations" included *inter alia* the "Failure to perform routine cleaning duties" and "Failure to comply with any order." Ex. 9 (Handbook Rev. 2011) at MCC002134-37; Ex. 10 (Handbook Rev. 2017) at MCC002473-76. And sanctions for such minor violations included "Cell restriction for twenty-three (23) hours per day for up to three (3) days"—also known as cell lockdown. Ex. 9 (Handbook Rev. 2011) at MCC002134-37; Ex. 10 (Handbook Rev. 2017) at MCC002473-76. The Handbook further provided that "[t]hree (3) or more minor violations in a thirty (30) day period will be considered a major violation," and that major violation sanctions included "Disciplinary segregation for up to fifteen (15) days per incident/charge." Ex. 9 (Handbook Rev. 2011) at MCC002134-37; Ex. 10

---

[3] *See also* Ex. 18 (Chief Clesceri RFA Answers) at RFA No. 27; Ex. 38 (Sheriff Nygren RFA Answers) at RFA No. 27; Ex. 39 (Chief Devane RFA Answers) at RFA No. 27; Ex. 17 (Sheriff Prim RFA Answers) at RFA No. 27; Ex. 40 (Chief Sedlock RFA Answers) at RFA No. 27; Ex. 41 (Chief Sitkie RFA Answers) at RFA No. 27.

[4] Disciplinary segregation, also known as solitary confinement, is a "sanction" involving "separation from the general population" alone in a single cell. *See* Ex. 9 (Handbook Rev. 2011) at MCC002128; Ex. 10 (Handbook Rev. 2017) at MCC002463; Ex. 42 (Special Management Unit Operations General Order) at MCC003280.

(Handbook Rev. 2017) at MCC002473-76. As a result, if a detainee refused to clean one time, the Handbook authorized punishment of up to three days of cell lockdown, and if a detainee refused to clean three times in thirty days, the Handbook authorized punishment of up to fifteen days in solitary confinement. Ex. 9 (Handbook Rev. 2011) at MCC002134-37; Ex. 10 (Handbook Rev. 2017) at MCC002473-76; *see also* Ex. 43 (Chief Devane Dep.) at 38:23-39:1; Ex. 7 (Sheriff Prim Dep.) at 38:8-40:8; Ex. 44 (Lt. Brooks Dep.) at 34:11-14. Defendants have admitted that they required Jail staff to implement this disciplinary policy at all times relevant to this lawsuit. *See* Ex. 6 (Sheriff's Office RFA Answers) at RFA Nos. 7-10; Ex. 17 (Sheriff Prim RFA Answers) at RFA Nos. 7-10; Ex. 38 (Sheriff Nygren RFA Answers) at RFA Nos. 7-10.

The Handbook—which conveyed the Sheriff's Office's threat of punishment for refusing to perform cleaning labor—was provided to every detainee upon admission to the facility. Ex. 9 (Handbook Rev. 2011) at MCC002121; Ex. 10 (Handbook Rev. 2017) at MCC002456; *see also* Ex. 17 (Sheriff Prim RFA Answers) at RFA Nos. 3-4, 6; Ex. 38 (Sheriff Nygren RFA Answers) at RFA Nos. 3-4. To further ensure that all detainees were aware of the threat of punishment, Defendants (i) required all detainees to sign a form to acknowledge receipt of the Handbook, (ii) required all detainees to maintain a copy of the Handbook in their cell, (iii) made an audio version of the Handbook available to detainees who could not read, and (iv) made the Handbook available in both English and Spanish. Ex. 9 (Handbook Rev. 2011) at MCC002121; Ex. 10 (Handbook Rev. 2017) at MCC002456; Ex. 45 (Sample Handbook Receipts); Ex. 46 (Spanish Handbook); Ex. 13 (Lt. Acevedo Dep.) at 35:6-36:3; Ex. 44 (Lt. Brooks Dep.) at 36:23-37:1. Detainees were well aware of the threat of punishment in the Handbook, which is sometimes called the "rule book." *See, e.g.*, Ex. 22 (Pl. Forero Dep.) at 39:24-40:21; Ex. 24 (Pl. Ruderman Dep.) at 126:1-9.

Defendants reinforced the threat of discipline communicated through the Handbook by

further warning civil immigration detainees, both verbally and in writing, that they would be punished if they refused an order to clean the dayrooms. *See*, *e.g.*, Ex.29 (Detainee Rodriguez Soto Decl.) ¶ 9 ("The correctional officers told me and the other ICE detainees that segregation would be a punishment eventually for not cleaning the dayroom."); Ex. 30 (Detainee Osorio Decl.) ¶ 2 ("Correctional officers told us that we had to clean or else we would all be placed on lockdown for the entire day or sometimes even longer."); Ex. 25 (Detainee Rasho Decl.) ¶ 5 ("The correctional officers told me that if I did not clean the dayroom, I would be put on lockdown."); Ex. 47 (Detainee Rodriguez Cerón Decl.) ¶ 2 ("The correctional officers made the detainees in my pod clean the dayroom every day. They told us that if we did not, they would lock us in our cell for up to three days."); Ex. 27 (Detainee Nuñez Ramirez Decl.) ¶ 5 ("I told [the correctional officer] that I didn't want to clean, but he said that, if I refused to clean the dayroom, I would be locked down in my cell as punishment."); Ex. 48 (Response to Nuñez Ramirez Greivance) ("READ YOUR RULEBOOK. IT STATES THAT EACH DAY THE DAYROOMS WILL BE CLEANED AFTER MEALS . . . . YOU NEED TO DO AS THE OFFICERS REQUEST; WHICH IS ALSO A RULE, WHICH IF YOU REFUSE YOU CAN BE LOCKED DOWN FOR.").

Defendants' own records reflect that, pursuant to the Handbook, they routinely acted on the threat of punishment by subjecting civil immigration detainees to lockdown and solitary confinement for refusing the daily 5:00 p.m. order to clean the dayroom as outlined in the Housekeeping General Order. *See, e.g.,* Ex. 49 (Detainee Angyal Disciplinary Record) (imposing three days of disciplinary segregation on civil immigration detainee for three minor violations, one of which was refusing "her turn to clean the day room" at 5:00 p.m.); Ex. 13 (Lt. Acevedo Dep.) 65:17-67:6; Ex. 50 (Detainee Tellez-Castro Disciplinary Record) (three-day lockdown for refusing "his turn according to the cleaning rotation"); Ex. 51 (Detainee Marin-Sanchez Disciplinary

Record) (two-day lockdown for refusing his "turn[] to clean the dayroom" at "1700 hr[s]" and for responding that he was "not a slave"); Ex. 52 (Detainee Martinez-Elias Disciplinary Record) (one-day lockdown for refusing to clean dayroom at 1700 hrs, after stating that he "couldn't clean because he has a bad back"); Ex. 53 (Detainee Guiterrez-Castellano Disciplinary Record) (three day-lockdown for refusing assignment to clean).[5]

The punishments imposed by Defendants served as a warning to all civil immigration detainees and ensured that they knew they could be disciplined for refusing to clean the common areas. Detainees consistently report that cleaning was required under threat of punishment, and that Defendants in fact followed through with punishments. Ex. 25 (Detainee Rasho Decl.) ¶¶ 6, 12, 14 ("I saw other civil immigration detainees get put on lockdown for not cleaning."; "I also saw other civil immigration detainees get put in the hole (or the segregation unit) for not cleaning."); Ex. 26 (Detainee Rasho Dep.) at 35:4-19; Ex. 24 (Pl. Ruderman Dep.) 123:10-18, 124:11-17 (observed many other people punished with lockdown for refusing to clean); Ex. 27 (Detainee Nuñez Ramirez Decl.) ¶ 9 ("I saw several other civil immigration detainees get locked down for refusing to clean the dayroom."); Ex. 47 (Detainee Rodriguez Cerón Decl.) ¶ 2 ("I saw other detainees be punished and locked in their cells without access to the dayroom when they did not clean."); Ex. 63 (Detainee Rodriguez Cerón Dep.) at 14:4-10; Ex. 29 (Rodriguez Soto Decl.) ¶¶ 6-7 ("When someone didn't clean, they got locked down."); Ex. 23 (Pl. Pocknell Dep.) at 82:17-83:11; 92:10-16 (sent to segregation for one week and locked down several times for refusing to

[5] The disciplinary records summarized above are only a few examples of the punishments routinely meted out to civil immigration detainees for refusing the daily 5:00 p.m. order to clean the dayroom. *See also, e.g.*, Ex. 54 (Detainee Sanchez Disciplinary Record); Ex. 55 (Detainee Busmanis Disciplinary Record); Ex. 56 (Detainee Pupolins Disciplinary Record); Ex. 57 (Detainee Gomis Disciplinary Record); Ex. 58 (Detainee Sanchez Disciplinary Record); Ex. 59 (Detainee Mbaye Disciplinary Record); Ex. 60 (Detainee Brahimi Disciplinary Records); Ex. 61 (Detainee Kolesnikov Disciplinary Record); Ex. 62 (Email re: Detainee OConnor Grievance).

clean the dayroom); Ex. 64 (Pl. Asolo Dep.) at 131:18-21, 132:7-13, 135:11-137:3 (locked down for refusing to clean the dayroom); Ex. 21 (Pl. Clarke Dep.) at 58:8-16, 63:14-64:3 (same). In sum, the threat of discipline for refusing to perform janitorial labor in the housing units' common areas was uniform and consistent as to all civil immigration detainees.

### C. McHenry County Benefitted from Civil Immigration Detainees' Forced Janitorial Labor.

McHenry County's contract to house civil immigration detainees was lucrative, even more so because Defendants relied on forced labor from detainees to perform essential facility operations. Defendants made tens of millions from this arrangement: In just 2016 to 2020 alone, McHenry County received more than $41 million in revenue. Ex. 1 (Sheriff Prim Aff.) ¶ 3; Ex. 7 (Sheriff Prim Dep.) at 70:16-71:12. The County used "[t]he revenue generated by the agreement" not just to fund the Jail, but "to fund many aspects of county government." Ex. 1 (Sheriff Prim Aff.) ¶ 4; Ex. 7 (Sheriff Prim Dep.) at 76:13-21; *see also* Ex. 65 (Invoices to ICE 2012-2022). Defendants were consistently focused on lowering costs and maximizing profits from the ICE bed rental program. Ex. 7 (Sheriff Prim Dep.) at 77:4-12, 96:24-97:3, 121:24-123:2. Without an unpaid labor force of civil immigration detainees, McHenry County would have incurred greater costs of paying janitors or contractors to clean. *See id.* at 15:19-16:17; Ex. 5 (Sheriff Nygren Dep.) at 18:14-24; Ex. 44 (Lt. Brooks Dep.) at 12:21-13:3; Ex. 12 (Officer Hermie Dep.) at 20:12-15; Ex. 13 (Lt. Acevedo Dep.) at 12:25-13:8. Stunningly, for all 650 beds and more than 120,000 square feet of the Jail, McHenry County employed only <u>two</u> janitors who were both exclusively assigned to clean the areas of the Jail where detainees and inmates were *not* permitted. Ex. 66 (Welcome Book) at 7; Ex. 7 (Sheriff Prim Dep.) at 23:13-18; Ex. 8 (Housekeeping General Order) at MCC000014. Driven by profit, Defendants exploited detainees who were involuntary confined at the Jail for the County's enrichment.

## LEGAL STANDARD

A class action shall be certified if it satisfies the criteria set forth in Rule 23(a) and one of three scenarios described in Rule 23(b). *See Shady Grove Orthopedic Associates, P.A., v. Allstate Ins. Co*., 559 U.S. 393, 398 (2010). When these two criteria are satisfied, certification of a class is mandatory because Rule 23 "creates a categorical rule," which entitles any "plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Id.*

The Rule 23(a) criteria are as follows: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, Plaintiffs seek class certification pursuant to Rule 23(b)(3), which requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Plaintiffs must demonstrate by a preponderance of the evidence that a proposed class satisfies the Rule 23 requirements. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); *Trotter v. Klincar,* 748 F.2d 1177, 1184 (7th Cir. 1984). Courts do not engage in an in-depth examination of the underlying merits at the class certification stage but, rather, examine only what is necessary to determine the propriety of class certification. *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019).

## ARGUMENT

### I. The Proposed Classes

Plaintiffs move to certify one proposed class for Plaintiffs' federal TVPA claims, which

has a ten-year statute of limitations, 18 U.S.C. § 1595(c), and a second proposed class for Plaintiffs' state law claims, for unjust enrichment and for violation of the ITVPA, for which the applicable statute of limitations is one year, ECF No. 52 at 12-13 (citing 745 ILCS 10/8-101):

> **The TVPA Class:** All civil immigration detainees who were assigned to clean their housing unit's common area in the McHenry County Correctional Facility from April 14, 2012, to February 28, 2022.
>
> **The State Law Class:** All civil immigration detainees who were assigned to clean their housing unit's common area in the McHenry County Correctional Facility from April 14, 2021, to February 28, 2022.

## II. Plaintiffs Satisfy the Requirements of Rule 23(a).

### A. The Numerosity Requirement is Satisfied.

The proposed Classes are so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The proposed TVPA Class contains over 7,700 members and the State Law Class contains over 500 members. Ex. 67 (Kaufman Expert Report) at 4, Appendices 2, 3 (listing each class member, names redacted). Both satisfy the numerosity requirement of Rule 23. *See, e.g.*, *Chavez v. Don Stoltzner Mason Contractor, Inc.*, 272 F.R.D. 450, 454 (N.D. Ill. 2011) ("A class consisting of more than forty members generally satisfies the numerosity requirement . . . .").

### B. Common Questions of Law and Fact Abound.

Rule 23(a)(2) requires "commonality," which means the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality element, Plaintiffs must show that the truth or falsity of class members' common contentions "will resolve an issue that is central to the validity of each one of the claims in one stroke." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality is generally satisfied when claims arise from standardized conduct that similarly affected all class members. *Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 437 (7th Cir. 2015) ("[A] company-wide practice is appropriate for class challenge . . . where there is a uniform policy or process applied to all.");

*Porter v. Pipefitters Ass'n Loc. Union 597*, 208 F. Supp. 3d 894, 906 (N.D. Ill. 2016) (finding commonality satisfied where claims were based on "union-wide policies"). That is patently the case here. The proposed class meets the commonality requirement of Rule 23(a)(3) because Plaintiffs' claims all hinge on common contentions that are capable of class-wide resolution.

**1. The TVPA Class**

Plaintiffs' TVPA claim turns on common factual and legal questions concerning Defendant's uniform forced janitorial labor policy. To establish a claim of forced labor under the TVPA, Plaintiffs must show that Defendants "knowingly . . . obtain[ed]" their "labor or services" by means of (1) "physical restraint, or threats of physical restraint," (2) "serious harm or threats of serious harm," (3) "abuse or threatened abuse of law or legal process," or (4) "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a). In the case of Defendant McHenry County, Plaintiffs can also establish TVPA liability by proving that the County "knowingly benefit[ed] . . . financially" from the other Defendants' policy of obtaining detainees' labor or services through one or more of the prohibited means. *Id.* § 1589(b).

To determine if the harms threatened were serious, the statute employs a "reasonable" person test: Was the threat sufficiently serious that a reasonable person of the same background and circumstances would feel compelled to continue working? *See id.* § 1589(c)(2). Accordingly, one critical question that is susceptible to common proof is whether the punishments outlined in the Handbook—a three-day lockdown and up to fifteen days in solitary confinement—constitute serious harm to a person in civil immigration detention.

Some of the other common factual and legal questions at issue include:

(1) Whether Defendants "obtain[ed]" the labor of putative class members under the TVPA,

§ 1589(a);

(2) Whether the cleaning tasks outlined in the Housekeeping General Order constitute "labor or services" under § 1589(a);

(3) Whether a three-day cell lockdown and up to fifteen days of solitary confinement constitute "physical restraint" under § 1589(a)(1);

(4) Whether the threats of cell lockdown and solitary confinement constitute an abuse of legal process when used to obtain free janitorial labor and thus reduce facility costs under § 1589(c)(1);

(5) Whether Defendants acted "knowingly" in obtaining civil immigration detainees' janitorial labor by prohibited means under § 1589(a);

(6) Whether the County "knowingly" profited from Defendants' unlawful scheme under § 1589(b);

(7) Whether the so-called civic duty exception to the Thirteenth Amendment exempts Defendants' forced janitorial labor policy from TVPA liability; and

(8) Whether the doctrine of "derivative sovereign immunity" protects Defendants from liability as a contractor of the United States.

These common questions have "common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. Whether Defendants "obtained" class members' labor turns on the policy and practice that applied to the entire putative Class: the uniform written Jail policy, outlined in the Housekeeping General Order and the Sheriff's Office's ICE Detainee Handbook, and orders of Jail staff, in accordance with that written policy, that civil immigration detainees must clean the common areas of the sections where they were housed every day. *See supra* Parts II.A and II.B. Moreover, because the mandatory daily cleaning tasks were outlined in the Housekeeping General Order, whether they amounted to "labor or services" under the TVPA will be determined on a class-wide basis. Likewise, because the Handbook threatened all civil immigration detainees with the same punishments, whether the threatened punishments amount to "physical restraint" and whether the use of those punishments to obtain free labor constitutes an abuse of legal process is also well-suited for common resolution. *Menocal v. GEO Grp., Inc.*, 882

F.3d 905, 916 (10th Cir. 2018) (quoting *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 264-65 (D. Colo. 2017)) (whether mandatory cleaning policy "'constitutes improper means of coercion' under § 1589" is a common question).

Furthermore, questions as to Defendants' knowledge of obtaining detainees' labor through prohibited means and knowledge of the benefits that labor conferred are also common to all class members. *Id.* (whether defendant knowingly obtained detainees' labor through allegedly coercive policy is a common question). Lastly, the viability of the affirmative defenses Defendants' attempt to assert—such as the civic duty exception and "Derivative Sovereign Immunity"—will be the same for all class members and thus are common questions subject to common proof. *See* ECF No. 143 at 1; ECF No. 144 at 1; *Menocal*, 882 F.3d at 916, 923 (ruling that the applicability of the civic duty exception is a common question that weighs in favor of predominance).

In *Menocal*, the Tenth Circuit affirmed class certification under nearly identical facts: civil immigration detainees brought TVPA forced labor claims alleging that the detention center operator's uniform policy required them to clean their housing units' common areas without pay and under threat of solitary confinement. 882 F.3d at 910-11. Similarly, in *Owino v. Corecivic, Inc.*, the Ninth Circuit affirmed certification of a class of civil immigration detainees held in twenty-four detention centers across the country based on the detention center operator's written policy of requiring detainees to clean the facilities' common areas on a daily basis under threat of punishment and without pay. 60 F.4th 437, 442, 446-47 (9th Cir. 2022). The Ninth Circuit determined that whether defendant utilized "threats of discipline to compel detainees to clean its . . . facilities in violation of state and federal human trafficking statutes" was "a quintessential 'common question'" "appropriate for class-wide resolution because either [defendant's] company-wide policies and practices violated the law and the rights of class members, or they didn't." *Id.* at

445. The same reasoning applies with even greater force here where the Class is comprised of detainees in only one detention facility—as opposed to twenty-four different ones.

In addition, several district courts throughout the country have certified classes of civil immigration detainees asserting claims based on uniform policies requiring them to work. *See Novoa v. GEO Grp., Inc.*, No. EDCV 17-2514 JGB (SHKX), 2019 WL 7195331, at *4-5 (C.D. Cal. Nov. 26, 2019)[6] (certifying TVPA forced labor class of civil immigration detainees required to clean housing unit common areas without pay and under threat of discipline); *Yeend v. Akima Glob. Servs., LLC*, No. 1:20-CV-01281 (AMN/PJE), 2025 WL 959968, at *1 (N.D.N.Y. Mar. 31, 2025) (certifying TVPA forced labor class of civil immigration detainees participating in work program); Order on Pls.' Mot. for Class Cert., *Nwauzor v. Geo Grp., Inc.*, 3:17-cv-05769-RJB (W.D. Wash. Aug. 6, 2018), ECF No. 114 (certifying class of civil immigration detainees participating in work program). As in these cases, because Plaintiffs' claim for violations of the federal TVPA hinge on the legality of the Sheriff's Office's uniform policy and practice, commonality is satisfied here.

**2. The State Law Class**

Likewise, commonality is satisfied for Plaintiff Asolo's[7] claims under the ITVPA, which turn on similar elements as the TVPA. A person commits "involuntary servitude" giving rise to a claim under the ITVPA by knowingly obtaining labor or services through *inter alia* (1) physical harm or threats of physical harm, (2) physical restraint or threats of physical restraint, (3) abuse of law or legal process or threats of the same, or (4) a scheme intended to cause the person to believe

[6] Unpublished cases cited herein are appended as Exhibit 78.

[7] Plaintiff Basaru Asolo is the only named plaintiff who was detained at the Jail during the proposed State Law Class period and, thus, is the only proposed representative for that Class. *See* ECF No. 52 at 12-13. All five Plaintiffs' claims arose within the class period for the TVPA Class.

that if the person did not perform the labor or services he would suffer serious harm or physical restraint. 740 ILCS 128/15(a); 720 ILCS 5/10-9(b). Like the federal TVPA, Illinois law defines "serious harm" objectively from the perspective of a "*reasonable* person of the same background and in the same circumstances." 720 ILCS 5/10-9(a)(7.5) (emphasis added). Thus, the same common fact issues from the TVPA also go to Plaintiffs' claims under the ITVPA, and the legal issues are likewise common.

The same is true of Plaintiff's unjust enrichment claim. To establish a claim of unjust enrichment under Illinois law, a plaintiff must allege that "the defendant has unjustly retained a benefit to the plaintiff's detriment and that [the] defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 886 (7th Cir. 2022) (alteration in original) (quoting *Hatcher v. Hatcher*, 2020 IL App (3d) 180096, ¶ 15, 158 N.E.3d 326). Resolution of Plaintiffs' unjust enrichment claims will turn on questions of law and fact that are common to the class. Some of the common questions regarding this claim include:

(1) Whether Defendants benefitted from their forced janitorial labor policy; and

(2) Whether Defendants should compensate civil immigration detainees for the benefit conferred on them because Defendants' retention of the benefit would be unjust.

Common evidence will provide a common answer to these questions. Defendants admit that the policy outlined in the Housekeeping General Order and ICE Detainee Handbook applied to all civil immigration detainees during the relevant period. *See supra* Parts II.A and II.B. Whether Defendants benefitted from this uniform policy by avoiding the cost of paid janitorial labor is therefore a question well-suited to class-wide resolution. Similarly, whether Defendants' retention of this benefit is unjust is a question that applies across the class. Plaintiffs contend that Defendants' retention of the benefit is unjust because Defendants utilized a policy of coercing

labor under threat of punishment from a civilly detained workforce, who were uniquely vulnerable as immigrants, and subject to Defendants' physical control. This "theory of unjustness" depends on "shared rather than individualized circumstances" and thus is common to the class. *See Menocal*, 882 F.3d at 924-27 (commonality met for unjust enrichment class of civil immigration detainees paid $1 per day for participation in work program). Therefore, Plaintiffs' State Law Class meets the commonality requirement.

### C. The Claims of the Class Representatives Are Typical of the Claims of the Members of the Putative Classes.

Under Rule 23(a)(3), a party seeking class certification must show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Unlike the commonality requirement, which focuses on attributes of the class as a whole, the requirements of "typicality" and "adequacy" in Rules 23(a)(3) and (a)(4) focus, instead, on the attributes of the class representatives and class counsel. *See* 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:28 (6th ed. 2026). The typicality requirement is satisfied when the named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). Factual differences among class members do not defeat typicality in a case dealing with a uniform policy or practice, provided that the unnamed class members have injuries similar to the named plaintiffs and that the injuries result from the same, injurious course of conduct. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232-33 (7th Cir. 1983).

Plaintiffs' claims are typical of the Classes that they seek to represent because Plaintiffs all performed work for Defendants pursuant to the same forced janitorial labor policy. Plaintiffs were all civil immigration detainees who were involuntarily confined at the Jail based on their

immigration status and not based on any criminal charges or conviction. Ex. 68 (ICE Detainee Spreadsheet)[8]; Ex. 69 (Pl. Asolo ROG Responses) at ROG No. 4; Ex. 70 (Pl. Clarke ROG Responses) at ROG No. 4; Ex. 71 (Pl. Forero ROG Responses) at ROG No. 4; Ex. 72 (Pl. Pocknell ROG Responses) at ROG No. 4; Ex. 73 (Pl. Ruderman ROG Responses) at ROG No. 4. Upon their admission to the Jail, Plaintiffs all received the Sheriff's Office's ICE Detainee Handbook outlining the discipline available for refusing to clean. Ex. 45 (Sample Handbook Receipts). As civil immigration detainees, Plaintiffs were all subject to the Sheriff's Office's Housekeeping General Order. *See* Ex. 6 (Sheriff's Office RFA Answers) at RFA Nos. 21, 22, 25. Accordingly, while detained, Plaintiffs were forced to perform janitorial labor in the common areas of the Jail for no pay, under threat of discipline, including cell lockdown and solitary confinement. Ex. 64 (Pl. Asolo Dep.) at 134:3-11 (stating that he complied with orders to clean the dayroom because he did not "want to go to segregation or go to lockdown three days"); Ex. 21 (Pl. Clarke Dep.) at 17:8-10 ("[T]hey was forcing us to work and without pay."); Ex. 22 (Pl. Forero Dep.) at 39:24-40:21; Ex. 23 (Pl. Pocknell Dep.) at 42:16-24; 82:17-83:11, 87:4-8; Ex. 24 (Pl. Ruderman Dep.) at 44:15-19, 126:01-09, 127:16-17, 129:09-13. The forced janitorial labor policy and its threat of lockdown and solitary confinement form the basis of Plaintiffs' forced labor and unjust enrichment claims, just as they form the basis of the putative class members' claims. Like the other members of the proposed Classes, Plaintiffs' claims depend on resolution of the legality of Defendants' challenged uniform policy and practice.

**D. Plaintiffs Will Adequately Protect the Interests of the Class.**

The requirement of "adequacy" in Rule 23(a)(4) "raises concerns about the competency of

[8] Defendants produced a spreadsheet containing data for all civil immigration detainees housed at the Jail during the class period (MCC003107). Plaintiffs have appended here only columns A-K of the spreadsheet and only the rows pertaining to the named Plaintiffs themselves.

class counsel and [potential] conflicts of interest" between the class representatives and absent class members. *Dukes*, 564 U.S. at 349 n.5; *cf. Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013) (noting adequacy test is not stringent and courts should not "be unrealistic about the role of the class representative in a class action suit" as the "role is nominal").

Adequacy is not an issue here. Plaintiffs' attorneys are seasoned and accomplished in class action litigation and other complex litigation, and have experience handling claims similar to the ones in this case, Ex. 74 (Truesdale Decl.) ¶¶ 3, 5-8; Ex. 75 (Janove Decl.) ¶¶ 13-15, 17-18; Ex. 76 (Briskman Decl.) ¶¶ 3-5; Ex. 77 (Kumar Decl.) ¶ 3, and there are no disabling conflicts among class members. Plaintiffs and class counsel will adequately represent the Classes' interests. All Plaintiffs responded to written discovery, prepared for and attended their depositions, and regularly communicate with class counsel. They understand their obligations as class representatives and are dedicated to obtaining a fair outcome for all class members. Ex. 74 (Truesdale Decl.) ¶ 11.

## III. Plaintiffs Meet the Requirements of Rule 23(b)(3).

Rule 23(b)(3) states that a class may be maintained if the requirements of Rule 23(a) are fulfilled and if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The TVPA and State Law Classes satisfy both conditions.

### A. Common Issues Predominate.

"Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (internal quotations omitted). "Individual questions need not be absent. . . . The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.*

Here, the claims of Plaintiffs and the putative class members all center on the legality or illegality of the Sheriff's Office's uniform policy and practice. As a result, the claims of Plaintiffs and the putative class members will be adjudicated based on the resolution of the common issues outlined in Section II.B above. These common questions easily predominate over any individual questions of law or fact. Because the claims of the class members "will 'prevail or fail in unison'" based on the adjudication of the legality or illegality of the challenged policy and practice, Rule 23(b)(3)'s requirement that common issues predominate is satisfied. *Svoboda v. Amazon.com Inc.*, 168 F.4th 956, 964 (7th Cir. 2026) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013)). Indeed, the Ninth and Tenth Circuits have found predominance satisfied under similar circumstances where civil immigration detainees brought TVPA forced labor claims challenging a policy requiring them to clean their housing units' common areas without pay or face discipline. *Menocal*, 882 F.3d at 918-23; *Owino*, 60 F.4th at 444-47.

Moreover, the calculation of damages does not undermine predominance. The categories of damages available under the TVPA include (i) economic harm, (ii) emotional distress damages, and (iii) punitive damages, as well as pre-judgment interest on the economic and emotional distress damages. *Leiva v. Clute*, No. 4:19-CV-87-TLS-JPK, 2020 WL 8514822, at *12-19 (N.D. Ind. Dec. 16, 2020), *report and recommendation adopted*, No. 4:19-CV-87 RLM-JPK, 2021 WL 307302, at *12-19 (N.D. Ind. Jan. 29, 2021); *Bolden v. Pesavento*, 158 F.4th 879, 883 (7th Cir. 2025) (prejudgment interest can be awarded on noneconomic damages, such as emotional distress). One way to calculate economic damages under the TVPA is by determining the value to the defendant of the services rendered. *See Leiva*, 2020 WL 8514822, at *12-13 (citing 18 U.S.C. § 1593(b)(3)); *see also Francisco v. Susano*, 525 F. App'x 828, 835 (10th Cir. 2013); *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1172 (D. Kan. 2018). Defendants' avoided costs can also be used to calculate

unjust enrichment damages. *See Stavropoulos v. Hewlett-Packard Co.*, No. 13 C 5084, 2014 WL 7190809, at *5 (N.D. Ill. Dec. 17, 2014) (applying Illinois law and stating that "disgorgement of profits is an appropriate remedy for an unjust enrichment claim"). Each category of damages outlined above can be calculated based on a common method.

First, class-wide economic damages and interest on those damages could be calculated based upon Defendants' uniform policy and practice as outlined in the Housekeeping General Order, as well as Defendants' own data about the dates of detention for each civil immigration detainee and detainee cell assignments. These could be used to calculate the number of cleanings completed by the Classes during the class periods. Ex. 67 (Kaufman Expert Report) at 11-13. Class-wide economic harm could then be determined by multiplying the number of instances of forced cleaning experienced by putative class members by the economic harm of each cleaning. *Id.* at 13. If a fact finder values those damages at the costs Defendants avoided by relying on putative class members' forced labor (as opposed to their employees' paid janitorial labor), that rate and amount can also be calculated and determined on a class-wide basis. *Id.* at 10, 14 (calculating the hourly cost to the County for union janitor cleaning). Moreover, regardless of the precise amount of the aggregate damages, each putative class member's share of the class-wide damages can be calculated based on the number of instances of forced cleaning attributable to that class member. *Id.* at 19. Likewise, for any annualized damages amount (whether economic or noneconomic), interest can be calculated mechanically on a class-wide basis. *Id.* at 16-19. In short, there is a common method of assessing class members' economic damages without the need for individualized investigation.

Second, given the common experience of the civil immigration detainees under Defendants' uniform policies and practices, it would also be suitable to calculate emotional distress

damages as a function of the number of times a class member was forced to clean just as courts in other TVPA cases calculate emotional distress damages for groups of plaintiffs on a per-day basis. *See Leiva*, 2020 WL 8514822, at *12-19 (awarding group of plaintiffs emotional distress damages of $200 each for every day they were forced to endure TVPA violations); *Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1328 (S.D. Ga. 2019) (same); *West v. Butikofer*, No. 19-CV-1039-CJW-KEM, 2020 WL 5245226, at *7 (N.D. Iowa Aug. 18, 2020) (same); *Belvis v. Colamussi*, No. CV 16-544 (JFB)(ARL), 2018 WL 3151698, at *7 (E.D.N.Y. Feb. 20, 2018) (same, but awarding $171 per day); *Wang v. Gold Mantis Constr. Decoration (CNMI), LLC*, 705 F. Supp. 3d 1190, 1208 (D. N. Mar. I. 2021) (same, but awarding $425 per day). This approach allows for the award of emotional distress damages, and interest on those damages, without the need for individualized inquiry.

Third and finally, whether Defendants' uniform forced janitorial labor policy and practice warrants imposition of punitive damages is an issue that would be determined on a class-wide basis and thus presents yet another common question with a common answer. *See, e.g.*, *Palmer v. Combined Ins. Co. of Am.*, 217 F.R.D. 430, 438, 440 (N.D. Ill. 2003) (deeming individualized proof of punitive damages unnecessary where "the focus is on the defendant's conduct").

Moreover, even if this case ultimately involved some individualized inquiry as to damages, that would not pose an obstacle to class certification. *See Messner*, 669 F.3d at 815 ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."). Accordingly, the first element of Rule 23(b)(3) is met.

**B. Class Treatment Is the Superior Method of Adjudication.**

The superiority requirement is met where a class action is "the most practical and efficient way to resolve the litigation." *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 898 (7th Cir. 2024). When there are many common issues of law and fact, "the superiority requirement likely poses no

serious obstacle to class certification." *Messner*, 669 F.3d at 814 n.5. Other factors, "including the lack of awareness of a claim, inability to access an attorney, or complex, costly discovery," such as expert fees, can also contribute to a finding that a class action is superior to other available methods. *Svoboda*, 168 F.4th at 967. Here, a class action is the superior method to resolve this litigation. Indeed, the benefits of class treatment are substantial.

As discussed above, the litigation turns almost entirely (if not entirely) on common questions and common evidence. There is no reason to litigate these same factual and legal questions thousands of times. Further, as former civil immigration detainees, class members may have less familiarity with their rights under U.S. law and the U.S. legal system, limited English skills, and fewer resources to retain counsel. Many former civil immigration detainees also fear retaliation given their uncertain immigration status or ongoing immigration proceedings, which makes them less able to pursue a claim against Defendants even if they had available resources. In addition, the cost of expert discovery to prove the common questions in this case could discourage individual litigation to vindicate Plaintiffs' important forced labor claims. These factors weigh in favor of class-wide adjudication. *See id.;* 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:65 (6th ed. 2026); *see also Clancy v. Salvation Army*, No. 22 CV 1250, 2026 WL 837402, at *7 (N.D. Ill. Mar. 26, 2026) (finding superiority satisfied where putative class members were "a vulnerable population, more likely to lack awareness of any possible claim, and less likely to have access to legal services").

Moreover, to the knowledge of Plaintiffs' counsel, no other potential class member has filed any claim in any court or administrative proceeding based on Defendants' forced janitorial labor policy. Thus, no other potential class member has demonstrated an interest in controlling this litigation. *See* Fed. R. Civ. P. 23(b)(3)(A)-(B). Furthermore, the Northern District of Illinois is the

appropriate forum for this lawsuit because the Jail is located in this district. *See* Fed. R. Civ. P. 23(b)(3)(C). Finally, this case does not present unusual manageability problems under Rule 23(b)(3)(D). On the contrary, as demonstrated above in Parts II.B and III.A., there are substantial common issues that outweigh any individual issues. Accordingly, the second element of the Rule 23(b)(3) inquiry is also satisfied.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that:

1. The Court certify the TVPA Class and the State Law Class;

2. The Court appoint Plaintiffs Aleksey Ruderman, Basaru Asolo, James Forero, Jason Clarke, and Chris Pocknell to represent the TVPA Class, and Basaru Asolo to represent the State Law Class; and

3. The Court appoint Plaintiffs' attorneys Elizabeth Mazur, Charles Wysong, Kate Schwartz, and Margaret Truesdale of Hughes Socol Piers Resnick & Dym, Ltd., Raphael Janove of Janove PLLC, Jay Kumar of Jay Kumar Law, and Jacob Briskman of Jacob Briskman Attorney at Law as class counsel for both Classes.

Dated: May 29, 2026 By: /s/ Margaret E. Truesdale

Elizabeth N. Mazur
Charles D. Wysong
Kate Schwartz
Margaret E. Truesdale
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com
cwysong@hsplegal.com
kschwartz@hsplegal.com
mtruesdale@hsplegal.com

Raphael Janove
Janove PLLC
115 Broadway, 5th Floor
New York, NY 10006
646-347-3940
raphael@janove.law

Jay Kumar
Jay Kumar Law
211 W Wacker Dr, Ste 200b
Chicago, IL 60606
(312) 767-7903
Jay@JayKumarLaw.com

Jacob S. Briskman
Jacob Briskman Attorney at Law
2624 W Fullerton Ave
Chicago, IL 60647
(312) 945-6207
Jacob.Briskman@gmail.com
*Attorneys for Plaintiffs and the Proposed Classes*