# EXHIBIT
# 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

-------------------------------------------------------

Aleksey Ruderman et al.,

Plaintiffs,

vs. Case Number 3:2022cv50115

McHenry County et al.,

Defendants.

-------------------------------------------------------

Deposition of Shannon Hermie

Thursday

March 7th, 2024

-at-

Zoom Remote Deposition

APPEARANCES

For the Plaintiffs:
Margaret E. Truesdale
Hughes Socol Piers Resnick & Dym, Ltd.
70 West Madison Street
Suite 4000
Chicago, Illinois 60602

For the Defendants:
Troy C. Owens
McHenry County State's Attorney
2200 North Seminary Avenue
Suite 150
Woodstock, Illinois 60098

RECORDER: Good afternoon. We are now on the record. Today is Thursday, March 7th, 2024. The time is now 1:04 p.m. We are meeting remotely today for the deposition of Officer Shannon Hermie in the matter of Aleksey Ruderman et al. v. McHenry County et al., case number 3:2022cv50115. The venue is Northern District of Illinois, Western Division. Officer Hermie, my name is Brenda Portillo. I'm a notary public, and I'm recording this deposition remotely as a representative

of Exhibit 5, LLC, which is doing business at 26 South Aberdeen Street, Suite 6, Chicago, Illinois 60607. This deposition is being recorded remotely via Zoom on behalf of Aleksey Ruderman et al. at the instance of Hughes Socol Piers Resnick & Dym, Ltd. The deponent's identity has -- has been confirmed off of the record by satisfactory evidence and they are physically located in the state of Illinois at this time. Officer Hermie, would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearances for the record?

MS. TRUESDALE: Margaret Truesdale for Plaintiffs.

MR. OWENS: Troy Owens for the County.

RECORDER: Thank you and that completes the required information. We can proceed.

EXAMINATION

BY MS. TRUESDALE:

Q. Good afternoon, Officer Hermie. I'm Margaret Truesdale. I am one of the attorneys for the Plaintiffs. I'm going to be asking you some questions this afternoon. Could you, first, just spell your name for the court reporter?

A. Yes, my first name is Shannon, S-h-a-n-n-o-n.

My last name is Hermie. That's H-e-r-m-i-e.
Q. Have you sat for a deposition before?
A. Once. 0:01:56
Q. Okay. So you may be familiar with the rules of the road, but I'll just go over them to make sure we're on the same page. So right now, this -- this deposition is being video recorded, and then, at a certain point, a court reporter may turn it into a transcript. So for that reason, it's important to sort of keep that transcript in mind when we're talking, and -- and I would just ask that you let me state my full question before you chime in with your answer so that we're not talking over each other. Does that make sense?
A. Sure.
Q. And then another item to keep in mind is that, again, because we're creating a record, in normal conversation, we might say, like, "uh-huh" or even answer a question nodding our head or shaking our head but that won't show up on a transcript. So it's important to give verbal answers like "yes" and "no." Does that make sense?
A. Yes. 0:03:02
Q. Okay. And the last thing that I would ask is if you don't understand one of my questions, would you

please let me know?
A. Yes.
Q. Okay. What did you do to prepare for your deposition today?
A. Spoke with State's Attorney's Office.
Q. Okay. When you spoke with the State's Attorney's Office, did you review any documents?
A. I did not.
Q. Okay. Are you currently employed by the McHenry County Sheriff's Office?
A. Yes.
Q. Are you -- is your current title classification officer?
A. Yes.
Q. On -- how long have you held the role of classification officer at the McHenry County Sheriff's Office?
A. Seven years.
Q. So if I'm doing my math correctly, did you assume that role in 2017?
A. Approximately 2017.
Q. What role did you hold before that?
A. Correctional officer. 0:04:18
Q. And did you first become a correctional officer for the McHenry County Sheriff's Office in

March of 2005?
A. Yes.
Q. And did you hold that position all the way from March of 2005 to about 2017?
A. Yes.
Q. As a correctional officer, did you have any particular areas of focus? Did you have -- I guess my question -- I could ask a different question. With -- under the umbrella of correctional officer, did you have any particular titles during that period of years?
A. Yes, I did.
Q. What -- what were those?
A. I was on a -- it's a special operations type of assignment. It was called CIU, corrections intelligence unit, at that time.
Q. What years did you do that?
A. I don't recall the years on that.
Q. What kinds of things did you do on the CIU?
A. We would download subpoena videos, file specific paperwork, that sort of thing.
Q. At that time, was -- when you would report to work, would you still report to the jail?
A. Yes. 0:06:12
Q. What -- were you working at the administrative offices of the jail?

A. No.
Q. What -- where were you stationed?
A. At a post after roll call.
Q. I'm sorry. I didn't catch the last part of what you said. "At a post"?
A. On -- on a post in the jail after roll call.
Q. I see. So first, you would report to one location for roll call, and then you would go to your post, is that right?
A. Yes.
Q. Aside from working with the CIU, did you have any other particular titles while you were a correctional officer?
A. No.
Q. Before you joined McHenry County Sheriff's Office in 2005, did you hold any other positions in law enforcement?
A. I was a correctional officer for the State of Illinois prior.
Q. Where -- where at?
A. Dixon, Illinois. 0:07:32
Q. How long were you a correctional officer at Dixon?
A. Approximately seven-and-a-half years.
Q. Did you -- before you worked at Dixon, did

you have any other law enforcement experience?
A. No, no, I didn't.
Q. When you were a correctional officer, before you became the classification officer, what were your duties?
A. They varied per the general orders of the sheriff, assigned to posts.
Q. And how long would you typically be at a given post?
A. Are you asking daily? Are you asking monthly? Yearly?
Q. Well, I don't know. I wonder if you can explain it to me.
A. We were assigned to -- could be assigned to any particular post that day after roll call. Could be removed from that post and assigned somewhere else at any point throughout the day at a sergeant's discretion.
Q. Were you sometimes -- was your post ever in the -- on the third floor?
A. Yes, it was. 0:09:12
Q. Was the third floor where the civil immigrant detainees were housed?
A. Yes.
Q. How -- how often were you posted in the area

of the jail where the civil immigrant detainees were housed?

A. I don't recall how often.

Q. Okay. Was it -- would you say, then, that you spent the majority of your time in that -- in those housing units?

A. No, I don't believe that.

Q. Now that you're a classification officer, what are your duties in that role?

A. In short, my duties are to classify and house people that are going to arrive there and be staying there a period of time.

Q. Could you explain what it means to classify someone?

A. We have a classification orientation sheet that is needed to be filled out based on a series of questions -- prior visits to the jail, medical history, a bunch of other factors that would weigh in to provide a score level for each individual, and then based on that score level, be housed in an area in the jail with other people that are similarly leveled.

Q. Is the score level, do you ever call that the security classification of the person?

A. Yeah, yes. 0:11:11

Q. Okay. And are they things like medium, low?

What -- what are the different classifications? Maybe you can tell them to me. Better than me guessing.

A. We have four. We have "zero" classification level, which is sentenced. We have "one," which is low level. "Two" is medium and -- and "three" is high.

Q. Okay. Could any of those classification levels of low, medium, and high apply to a civil immigration detainee?

A. I don't believe that.

Q. Okay. Which security classification levels can apply to a -- an ICE detainee?

A. Well, that -- that was determined by immigration solely on their own. By the time they arrived to us at our facilities, they were already classified in the levels that they had worked through.

Q. So is it accurate to say that you -- you were not, personally, classifying the ICE detainees, is that right?

A. Correct, I was not. 0:12:30

Q. Okay. But even though they arrived with a classification from ICE, was it your job to figure out where they should be housed in the jail based on whatever classification ICE gave them?

A. Yes.

Q. Did you have any role or any involvement with

the voluntary work program at the jail?

A. Did you say, "voluntary work program"?

Q. Yes.

A. Yes, I had involvement in that -- that, yes.

Q. What was your role in the voluntary work program, or what is it because you're still a classification officer right now? So in the period where you've been a classification officer, what is your role in the voluntary work program?

A. My role in the voluntary work program is that residents that submit to work voluntarily or choose to want that opportunity can submit requests to classification for work or clearance based on -- and it's based on criteria that they have.

Q. Anything else?

A. They would have to be less than a level three. They'd have to be cleared medically and not have discipline on their record.

Q. And in terms of your role, were you making a decision about who was eligible to participate in the voluntary work program?

A. Based on the criteria that I just outlined, yes.

Q. Were you -- are -- is there typically just one classification officer at a time, or are there

multiple classification officers?

A. We have two. 0:14:32

Q. Who's your colleague that is your -- the other classification officer?

A. Who is he by name?

Q. Yes.

A. Trever Schwarz.

Q. Have you two been the two classification officers for the last seven years or did you -- or did you previously work with a different classification officer?

A. We have not. He -- he recently started this position in January.

Q. Who was the other classification officer before that?

A. Paul Veneziano.

Q. What -- how long did you and Paul Veneziano overlap as the two classification officers?

A. The seven years that I've been in.

Q. I see. Did you have any role in supervising any of the voluntary work program participants?

A. No. 0:15:42

Q. Did you -- okay. Did you have any role in providing any training to any voluntary work program participants?

A. No, that was the responsibility of the -- the assignment, itself.

Q. When you were -- before you became the classification officer, when -- in -- in 2017, preceding that, did you have any role in supervising any voluntary work program participants?

A. Yes, I did.

Q. And could you describe that a bit?

A. Housing unit block workers, I would supervise them cleaning. I also supervised kitchen workers in the kitchen.

Q. What are "block workers"?

A. Those are workers assigned to work in a housing unit, and they're specific for that housing unit.

Q. Are they -- when you say, "block worker," does that always refer to a voluntary work program worker?

A. Yes. 0:17:16

Q. What -- what kind of work did the block -- do the block workers perform?

A. Block workers would perform duties such as sweeping, mopping, passing out dinner trays.

Q. Where did they -- did -- did they do anything else?

A. Maybe take out trash from the housing unit, put it in the hallway.
Q. Anything else?
A. That's about it.
Q. When you say they did sweeping and mopping, where did they do that?
A. Common areas.
Q. Which common areas?
A. Hallway -- hallways, dayrooms.
Q. Could -- could ICE detainees work as block workers?
A. Yes, they could. 0:18:36
Q. Did they?
A. At some times, yes.
Q. What -- what times did they work as block workers?
A. Various times throughout the day.
Q. I guess when you said, "some times," I thought you meant, like, during certain years ICE detainees were permitted to work as block workers or in other years, no. Is that -- is that the case?
A. Rephrase that again, please.
Q. Sure. Over the course of the time that ICE detainees were housed at the McHenry County Jail, were there some periods of time where the ICE detainees were

not permitted to work as block workers?
A. They are permitted to be block workers in their housing unit, so they had to work in their unit as voluntary block workers.
Q. Over that -- over that entire period of years, were the ICE detainees -- were housed at the McHenry County Jail?
A. Yes. 0:20:07
Q. Would block workers -- strike that. Have you ever heard the term "section worker"?
A. No, I have not.
Q. You mentioned the block workers would sweep and mop in the dayrooms. What would be the circumstances where a block worker would sweep or mop in a dayroom?
A. As -- as needed. If there's dirt on the floor that needs swept.
Q. So it wasn't on a set schedule, right?
A. There is a set schedule, yes.
Q. There's a set schedule for block workers to sweep and mop in the dayrooms?
A. There's a set schedule for passing out trays and cleaning up after that part of it. Everything else is as needed.
Q. Okay. So for sweeping and mopping the

dayroom floors, the block workers don't have any particular set schedule to do that, right?

A. No. 0:22:07

Q. Okay. It's just, like, if there's a mess, then the block workers would clean that mess up, is that right?

A. Correct.

Q. As a -- as a classification officer, who do you report to?

A. I report to my supervisor, Matthew Rotes, the sergeant.

Q. Does Matthew -- Sergeant Rotes have a particular area of focus at the jail?

A. Well, he's my supervisor for classification. I don't know what you mean by "focus."

Q. Okay. Is -- would he be called something like a classification sergeant, or does he have any specific title?

A. He's a classification sergeant. I believe he has other responsibilities too.

Q. Do you have any people who report to you?

A. Say again, please. Rephrase?

Q. Are there any McHenry County Sheriff's Office employees that report directly to you?

A. No. 0:23:18

Q. By the time you joined the McHenry County Sheriff's Office, the County had already entered into a contract with the federal government to house ICE detainees, right?
A. Yes, that's correct.
Q. Are you aware of when the ICE detainees were no longer housed at the jail?
A. I don't recall.
Q. Does -- does it match your memory that it was in early 2022?
A. I don't believe that.
Q. Okay. Is there another -- do you have another estimate of when ICE detainees were no longer housed at the -- at the McHenry County Jail?
A. I do not. I don't recall those dates.
Q. Okay. But you agree they're not there anymore, right?
A. They are not here anymore.
Q. And when you started your role as classification officer, the ICE detainees were still housed at the jail, right?
A. Yes. 0:24:35
Q. While those ICE detainees were housed at the jail, the ICE detainees and the inmates had to be kept separate, right?

A. That's correct.
Q. Why -- why was that?
A. That's per policy. Per sheriff's office policy. Per ICE policy.
Q. Do you know the purpose of the policy?
A. I don't recall the exact verbiage of the purpose.
Q. And the jail followed that policy, right?
A. I believe so.
Q. It's important to maintain a safe and sanitary jail facility, right?
A. It is.
Q. And -- and maintaining a safe and sanitary jail facility is important to -- to protect the safety and well-being of staff, right?
A. Correct. 0:25:56
Q. And it -- it protects the safety and well-being of detainees as well, right?
A. Yes.
Q. Jails are congregate living facilities, right?
A. Explain, please.
Q. In a jail environment, there are a lot of people housed in a small space, right?
A. Yes.

Q. And -- and for that reason, sanitation is especially important in a jail, right?
A. Yes.
Q. The -- the jail is also subject to some professional standards about sanitation, right?
A. Correct.
Q. And if the jail doesn't maintain sanitary conditions, there can be negative consequences, right?
A. I'm unaware of what negative consequences could happen.
Q. Okay. I can ask some specific examples. A disease could spread, right?
A. True. 0:27:14
Q. The jail could fail an inspection if it wasn't maintaining a sanitary living environment, right?
A. Correct.
Q. The jail could even get sued if it was maintaining unsanitary conditions, right?
A. Could.
Q. So keeping the living units clean and sanitary is something that has to get done no matter what, right?
A. Correct.
Q. I'm sorry. I didn't catch that.

A. Correct.
Q. And if the -- if the jail couldn't rely on the detainees to perform the cleaning, it would have to hire someone else to do it, right?
A. I -- I don't understand that question.
Q. Well, someone has to do the cleaning in the jail, right?
A. Correct.
Q. And the ICE detainees would perform cleaning in their housing units, right?
A. Yes. 0:28:24
Q. If the ICE detainees were not cleaning the housing units, the jail would have to get someone else to do it, right?
A. Most likely, yes.
Q. Officer Hermie, are you aware of how detainee disciplinary records are stored at the jail?
A. I am familiar with that.
Q. How are they stored?
A. You're asking about -- reask that again, please.
Q. How are disciplinary records stored at the jail?
A. On my end, they're uploaded to a -- a Z drive file that I have access to, and I file that away in a

particular detainee or inmates file and attach it.
Q. So if you -- if you prepare a disciplinary order, you sort of upload to a system. Is that what you're saying?
A. Yes. 0:29:26
Q. Like, if you're the person that fills it out, then you need to scan it and upload it to be stored, is that correct?
A. There are -- not totally correct. There are many parts -- moving parts of the disciplinary process. Some forms are scanned to me from someone else who has filled these forms out. Then I would put them away in a -- a person's file from there.
Q. Are the -- are the disciplinary records stored -- are they organized by subject matter?
A. They're organized by incident report number.
Q. Is that, like, a random number that's assigned to the disciplinary record?
A. It's a chronological number based on year.
Q. Are they organized by offense number?
A. They're organized by the year and the amount of reports that have happened so far.
Q. Are you familiar with offense numbers like minor number nine, things like that?
A. Vaguely, yes. 0:30:55

Q. Is that -- when you're uploading disciplinary records, do you tag them with the offense number before you upload them?
A. The -- the offense number is tagged underneath the informational report number.
Q. If you wanted to find all of the disciplinary records for, say, minor number nine, could you, like, go into the computer system and select for that offense number and look only at those disciplinary records?
A. Perhaps. However, our Vision [phonetic] jail program isn't set up in that manner.
Q. Do you know -- when we're talking about discipline, do you know what a major violation is?
A. Yes. 0:32:22
Q. What's a major violation?
A. A major is a -- a violation that is higher than a minor. A major violation is something that's much more serious than a minor violation would be.
Q. Are major violations eligible for disciplinary segregation?
A. Yes.
Q. And minor violations are not, correct?
A. Correct.
Q. In your experience when you were a correctional officer, and now as a classification

officer, how often do major violations take place?
A. Repeat that, please.
Q. In your experience working at the jail, how often are -- do major violations take place?
A. Are you asking daily, weekly, monthly?
Q. Well, sure. I could specify. So for example, in a week, how frequently do you see major violations taking place?
A. In a week's time frame, there could be a couple, and there could be ten.
Q. Are you familiar with performance-based national detention standards?
A. Vaguely.
Q. What do you -- what -- what do you know about them?
A. All I'm aware with them is the title.
Q. Okay. Do you -- are you familiar with those as being ICE standards?
A. Perhaps. That sounds more familiar.
Q. Okay. Are you familiar with something called the national detention standards for non-dedicated facilities?
A. Sounds familiar, yes. 0:34:43
Q. Okay. Are -- it sounds like your familiarity is -- are -- are a bit limited. Is my -- am I getting

that right?
A. Yeah.
Q. Okay. Do you know whether either of those applies to McHenry County -- or a -- let me say it a different way. Are you aware if either or both of those standards applied to the McHenry County Jail when it was housing ICE detainees?
A. I don't recall that.
Q. Okay. Does the sheriff's office have general orders that apply to operations at the jail?
A. Yes.
Q. What is a "general order"?
A. A general order is what the title says. It's a general order coming from the sheriff.
Q. It's officially promulgated by the sheriff, right?
A. I'm unfamiliar with the word promulgate.
Q. It's -- the -- the sheriff puts them into effect, is that right?
A. Yes. 0:35:58
Q. Once a general order goes in effect, are jail staff expected to know the contents of the general order?
A. Yes.
Q. Jail staff are expected to follow the general

orders as well, right?

A. Correct.

Q. Was there any -- has there been any system in place to notify jail staff about general orders?

A. We have a computer program that -- called PowerDMS and it's a system -- a database where general orders are uploaded to by our administration, requiring staff to read and sign off on.

Q. If -- if someone is just joining the jail staff, would they undergo training regarding the general orders?

A. Yes. 0:36:58

Q. I'm going to pull up a document on the screen. This is labeled Exhibit 5, and it's Bates stamped MCC4 to MCC6. Officer Hermie, do you see, at the top, this says, "general order"? Do you see that?

A. Yes.

Q. And it says it was issued March 30th of 2010. Do you see that?

A. Yes.

Q. And then it gives a GO number 3.4.4-01. Do you see that?

A. Yes.

Q. And then below that, it says, "chapter title, sanitation and hygiene; subject, facility

housekeeping." Do you see that part?
A. Yes.
Q. Are you familiar with this document?
A. I am familiar with it, yes.
Q. And what -- what do you know it to be?
A. Exactly what it says.
Q. Okay. Is this in the McHenry County Sheriff's Office's -- a facility housekeeping general order?
A. Yes. 0:38:17
Q. And this policy went into effect -- strike that. This policy has been in effect since -- since it was issued in -- on March 30th of 2010, correct?
A. Correct.
Q. And this policy applies, not just -- it applies to anyone who is housed at the jail, right?
A. Correct.
Q. I want to scroll down to this part -- Roman numeral IV, procedures. It says, "General housekeeping. The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and detainees/inmates." Do you see that?

A. I do. 0:39:22

Q. It -- it refers to a "housekeeping and maintenance plan." Are -- are you aware of any housekeeping and maintenance plan that's separate from this general order?

A. Yes, we do have maintenance and housekeeping that are separate from -- from this.

Q. Are you aware of any written document that -- any written plan related to housekeeping and maintenance?

A. I'm unaware of what it would be, or where it would be at.

Q. So you -- you haven't seen a housekeeping and maintenance plan, as a written document, outside of what's in this general order, right?

A. Correct.

Q. At the end of that paragraph that I was just reading aloud, there's this citation in parentheses. Do you see where I'm highlighting?

A. Yes. 0:40:32

Q. Do -- are you familiar with that?

A. I am not.

Q. Okay. I think at the top -- okay. Do you recognize that to be an -- a reference to an ACA standard at all?

A. I don't believe so. So I don't -- I don't recall what that would be.
Q. Okay. And then in the next paragraph, paragraph two, it says, "The janitorial staff shall be responsible for the housekeeping and general upkeep of all public and staff restrooms, offices, staff elevators, visiting areas, staff locker rooms, staff dining areas, and any other areas where detainees/inmates are not permitted." Do you see that?
A. Yes.
Q. Is -- are you aware if the -- if the jail, in fact, had janitorial staff?
A. Repeat that question, please.
Q. Does the jail have janitorial staff?
A. Yes, we have janitorial staff.
Q. And the janitorial staff, those are not detainees or inmates, right?
A. Correct. 0:41:53
Q. Okay. Those are employees of the sheriff's office, right?
A. Yes.
Q. How many janitorial staff are typically employed at one time?
A. I don't know that. I don't have the answer to that.

Q. Okay. Does two to three sound accurate?
A. Two or three are sometimes visible throughout a shift. As far as a hard number, I don't -- I don't know a hard number for you.
Q. Did -- have you -- are you aware -- let me say that differently. Have the janitorial staff cleaned any areas outside of what's listed here?
A. Not that I'm aware of.
Q. Okay. I want to bring your attention to Roman numeral III, definitions, paragraph A. It says, "section worker." Do you see that?
A. I see that. 0:43:12
Q. And it says, "Section worker: Detainee/inmate workers assigned to work only within their assigned housing unit/section." Do you see that?
A. Yes.
Q. That was a "yes"?
A. Yes.
Q. Okay. I -- I think you said earlier that you haven't heard this term "section worker," right?
A. I didn't recall it. That's correct.
Q. Okay. Does this jog your memory at all?
A. Yes.
Q. Okay. It -- is this an accurate definition for section worker?

A. At that time, I believe that's accurate.
Q. Is -- has -- is that term used differently now?
A. Sometimes, the terms are used differently. Sometimes, it's section worker. Sometimes, it's block worker.
Q. Are you saying that some -- that section worker and block worker can be used interchangeably?
A. From time to time, it's been verbally used interchangeably.
Q. Here, as it's used in this policy, it's not used to mean block worker, right?
A. That's correct. 0:44:36
Q. And that's because these section workers are not voluntary work program workers, right?
A. Meaning "volunteer worker program," they are not part of the worker program that is separate from this.
Q. Section -- I want to just scroll down a bit to paragraph B. It says, "Detainee/inmate worker assignments" and then it -- and then it lists out various cleaning duties which I'll read. Detainee/inmate section workers shall be responsible for the general housekeeping of all common areas within each housing unit. This shall include the following

areas: all showers, dayroom restrooms, dayroom common areas. The following housekeeping procedures shall be performed in all housing units on a daily basis: collect all trash from all wastebaskets throughout the housing unit, clean all tabletops in the dayroom, sweep all floors throughout the pod, mop all areas swept, clean all windows, wipe down all telephones, video visitation stations, dust all furniture shelves, etcetera, clean detainee/inmate showers, clean dayroom restrooms, refill dispensers. Do you see that?

A. I see these. 0:46:23

Q. The section workers were required to perform all of these cleaning responsibilities on a daily basis, correct?

A. They were asked to clean certain areas but not all areas or items on this list were cleaned on a daily basis.

Q. Is that because they refused or because they were not asked to perform all of these on a daily basis?

A. That was because it wasn't needed. They weren't asked to perform all of these on a daily basis.

Q. Which of these are daily basis items?

A. Daily basis items I would say are the showers were cleaned daily. The dayroom restrooms -- there's

one toilet in the dayroom. It would take, literally, a minute to clean. Dayroom common area, meaning the -- sweeping the floor and mopping. Some of the tables would be cleaned off, you know, four or five tables would be cleaned off on a daily basis, but they weren't always dirty. So sometimes, it didn't always warrant that.

Q. Would they -- would the section workers be required to collect the trash from the wastebaskets every day?

A. There's a trash can in every resident's cell that they're not responsible for. They're responsible for their own trash can. There's a collective dayroom trash can -- there's one or two, and those -- those workers in that common area would take that trash out.

Q. So these -- just to make sure we're talking about unpaid section workers in this general order, correct?

A. Correct. 0:48:23

Q. And the unpaid section workers would be responsible for collecting the dayroom trash bin, correct?

A. Common area trash, yes.

Q. Was the spot cleaning of all windows something that the unpaid section workers would do on a

daily basis?

A. Some windows were cleaned, but they'd be windows that were accessible by a common area. Not in a cell or a specific individual's room. There are windows that are on the opposite side that lead out into the hallway. Those windows will be cleaned relatively frequently as part of a common area.

Q. By the -- sorry. Where were those last windows that you just described?

A. Those windows are big windows at the entry of the section from out in the hallway. Not anything to do with a resident's cell window or private space.

Q. Right. So those windows are -- the windows here describing -- that are at the front of the section, those are still within the dayroom, right?

A. Correct. 0:49:42

Q. Okay. And -- and those would be cleaned by the unpaid section workers, right?

A. Yes.

Q. Was that done on a daily basis or less frequently?

A. I'd say less frequently. That was probably done a couple times a week.

Q. Okay. What about the wiping down of all telephones/video visitation stations? Was that on a

daily basis or less frequently?

A. That was actually somewhat rare, meaning that they weren't required to clean these phones. Most of the individuals would decide to clean it themselves when they got on the phone due to the fact that they may not want it being dirty. So that was something that was -- was probably, in my recollection, rarely done by someone that was cleaning the dayroom as a whole.

Q. This general order does say that the wiping down of telephones and video visitation stations must be performed every day, right?

A. Where does it say every day? On a daily basis. Yes, it says that.

Q. Okay. But are -- are you saying that sometimes the officers -- with the wiping down of the telephones and video visitation stations, sometimes the officers wouldn't require that?

A. No, sometimes, they wouldn't require it because it wasn't needed.

Q. Okay. What about the dusting of furniture and shelves? Was that performed on a daily basis?

A. That was rare. Maybe once a week.

Q. Okay. What about refilling dispensers? Do you know what that means?

A. I don't recall what that means. We didn't have paper towel dispensers in there at the time so I -- I can't say that that ever happened that I saw.

Q. And there was bar soap utilized, right?

A. There's bars of soap utilized? I don't understand.

Q. Yes, there weren't soap dispensers that needed to be refilled with liquid soap?

A. Yes, there -- yes, there probably were, but that was a rarity also because they had bar -- bar soap of their own.

Q. Okay. So the items that you talked about being performed on a daily basis -- the showers, the toilets, the sweeping and mopping, and the wiping down of tables -- that -- those tasks were performed by the unpaid section workers even if it was the weekend, right?

A. Correct. 0:52:43

Q. Even on holidays, right?

A. Correct.

Q. What time of day did they perform those cleaning duties?

A. They perform these cleaning duties shortly after breakfast, lunch, and dinner.

Q. Are -- are you aware of which of these duties

they performed after breakfast?
A. I'm not aware.
Q. Okay. Was it sort of broken up between those three time periods -- breakfast, lunch, and dinner?
A. I would say so as a -- a -- an as -- as-needed basis during those time frames.
Q. Okay. Was dinner usually from 5:00 -- or the after-dinner cleaning, was that typically from 5:00 to 6:00?
A. Correct. 0:53:53
Q. Was that -- I think you said, "correct," right?
A. Are you asking me the time frame that they're cleaning is between 5:00 and 6:00?
Q. Yes.
A. That was the time frame allotted for them to clean was between 5:00 and 6:00, but it rarely [sic] took 15 to 20 minutes to accomplish that. So it wasn't a requirement for them to clean that entire hour.
Q. Okay. But the -- the housing unit would be locked down from 5:00 to 6:00 p.m. to allow for the performance of all those cleaning tasks -- those daily cleaning tasks, correct?
A. Correct, the ones that needed to be completed.

Q. So if that's what was happening during that 5:00 to 6:00 p.m. period of time, what cleaning tasks did the section workers perform at breakfast?
A. As needed. Various times as needed.
Q. So when you say, "as needed," do you mean that if there was a mess, whoever was the assigned section worker for that day would be responsible for cleaning it up?
A. They would assist. Example, dayroom restrooms. If they were cleaned in the morning time and the dayroom restroom wasn't used, they wouldn't need to be cleaned again at lunchtime.
Q. Sure. And -- but under what circumstance would the dayroom restrooms be cleaned by the section workers in the morning?
A. As needed. In the morning and at night possibly.
Q. Okay. So if they -- they might have to clean the restrooms twice in one day if they got dirty in between breakfast and dinner, for example?
A. Perhaps. 0:55:54
Q. How many -- I know we talked about that the ICE detainees were housed in the housing units on the third floor, right?
A. Correct.

Q. So focusing on those ICE detainee housing units, how many showers did a housing unit contain?

A. Two showers in each section for the large sections.

Q. And how -- and I think you said there was one toilet in each section, right?

A. One toilet in each section dayroom.

Q. Right. And in each section dayroom, there's -- was there one sink as well?

A. There's a sink, yes.

Q. Okay. How many tabletops would it be [sic] in one section's dayroom?

A. Approximately five to six.

Q. How -- how many people would be housed in a given section?

A. It's a maximum of -- maximum capacity in a large section is 62.

Q. So each table fits, I guess, at least ten people, is that right?

A. Could. 0:57:31

Q. Okay. It's a -- did it vary based on the section?

A. Explain, please. I don't understand what you're asking.

Q. So you said that there are 62 people who

would be housed in the section, and you said there are about five or six tables. So I'm just doing the math. If that -- that -- that would mean the tables would have to sit about ten people each, is -- is that -- is that about the layout that -- that you're describing?

A. Well, I should correct something. There's a max -- maximum capacity in a section of 64. There's 16 rooms on the bottom, 16 rooms on the top. However, that's -- considering if the section was entirely populated in full, that many people, perhaps, may have to sit at a table. The sections, a lot of times, were very rarely completely full, and some detainees didn't come out of their cells to eat.

Q. Uh-huh. Okay. How many telephones would -- are -- were in a given section?

A. I believe four. 0:58:37

Q. And how many video visitation stations?

A. Last I looked, I believe three.

Q. And it talks about dusting furniture and shelves. What was the furniture aside from the tables we already talked about?

A. There were plastic chairs in the dayroom.

Q. Anything else?

A. There's a couple magazine and book racks.

Q. As far as shelves, were there shelves in the

section dayroom?
A. I don't recall there being shelves, per se, like one would think about a shelf would be.
Q. Okay. Was there, like, a bookcase that would hold books and -- and games and things like that?
A. Yeah, yes, there'd be one of those.
Q. Okay. Okay. Let's scroll down to this last section in -- of this general order, part C, "selection of section workers." Do you see that?
A. Yes. 1:00:00
Q. Okay. This says, "Detainee/inmate section workers shall be selected on a rotating basis based upon their cell assignment. Block/housing unit officers shall develop a rotating schedule that has the detainees/inmates in each cell taking a daily turn being the section worker for their housing unit." Does that match up with how the cleaning responsibilities were assigned during the ICE contract?
A. Yes.
Q. Then it says, "In the event there is only one detainee/inmate in a cell, then that detainee/inmate shall be assigned to work with another detainee/inmate that is in a single cell. In the event there are no other cells in the section housing only a single detainee/inmate, then that detainee/inmate shall be

assigned to work with another pair of detainees/inmates scheduled to be the section workers for the day." Do you see that?

A. Yes.

Q. And does that match up with how the section workers were assigned -- how ICE detainee section workers were assigned?

A. Yes. 1:01:17

Q. Do you know were officers expected to keep some kind of a record of which section workers were assigned on each day?

A. I don't recall the exact system.

Q. Does it ring a bell at all that maybe there was, like, a month -- a form for the month that had blanks in it and the officers would fill in the names of the detainees over the course of the month and sort of fill that sheet out each day?

A. Perhaps. What I remember seeing is a -- a calendar of cells. Just this cell, this date. This cell, this date.

Q. Okay. Do you know who would prepare that calendar?

A. Typically, it'd be the staff in the -- in -- assigned to that section.

Q. Do you recall what would happen to the

calendar at the end of the month?

A. No, I do -- I do not. I don't know where that -- it wasn't an official form or an official document as such.

Q. Okay. When you were a correctional officer, did you get any instruction about how to select detainee section workers aside from what's in this general order?

A. Rephrase that. Can you ask that again, please?

Q. Sure. Outside of what's in this general order, did you receive any instructions about how to select detainee section workers for section worker cleaning duties when you were a correctional officer?

A. We were advised that we could use our discretion as to who worked and when. If somebody were to fall ill, or if someone was gone to court, we could skip a room and go to the next room.

Q. And you were -- that was a -- that instruction -- was given orally, right?

A. Correct. 1:03:55

Q. You're not aware of any document, outside of this one, that outlines any policy on that topic, correct?

A. No, I'm not.

Q. This -- this description of the selection of section workers doesn't specify the frequency with which any individual detainee would be selected as a section worker, but, in your experience, would the frequency that a detainee would be selected as a section worker depend on how many people were housed in that section at a given time?

A. That -- potentially, yes.

Q. Okay. That's because the -- the selection of detainees was on a rotating basis, right?

A. Correct.

Q. So if there are more people, they're sort of more people to share the responsibility, right?

A. Correct.

Q. But if there are fewer people, it's going to be your turn more often, right?

A. Correct. 1:05:04

Q. What -- what would be the daily schedule of an ICE detainee who's working in the voluntary work program?

A. For which position?

Q. Well, let's start with the kitchen.

A. The kitchen?

Q. Yes.

A. At a particular time, a group of voluntary

worker paid detainees would be called up on the intercom. They are typically aware of what time they go to work. They would assemble in an area, and they'd be escorted down to the kitchen and conduct their kitchen duties down there.

Q. And what would be the -- the hours that they would work?

A. The hours change quite a few times over the years we had the immigration contract. I couldn't tell you an exact definite of what those hours were.

Q. Would voluntary work program workers conclude their duties by 5:00 p.m.?

A. I couldn't -- I can't recall the exact time they would conclude their duties.

Q. All jail personnel was expected to comply with this general order, right?

A. Correct. 1:07:05

Q. Okay. Were there any periods of time, from when you started working as a correctional officer until early 2022, where this general order was not -- was not in effect?

A. I don't recall if it was in effect at any point in time during that time frame or not.

Q. Okay. Okay. You don't have any recollection of there being a period of time where this general

order was not in effect, right?

A. I do not.

Q. Jail staff wouldn't have the authority to just disregard what's in this general order, right?

A. Correct.

Q. Sorry?

A. Correct.

Q. If a detainee refused to perform their assigned cleaning duties as outlined in this general order, would that warrant discipline?

A. Discipline in -- meaning what kind?

Q. What kind of discipline would it warrant?

A. I'm not saying it would warrant any discipline. I'm asking you what kind of discipline. Minor or -- or major?

Q. Well, I guess I -- I'll ask my question a different way. If a detainee refused to perform the cleaning duties outlined in this general order, would that warrant discipline of any kind?

A. I'm -- I am not aware of any instance where any discipline was issued to a detainee for specifically not cleaning.

Q. Did you -- were you -- did you ever witness a detainee who refused to -- to perform their cleaning duties outlined in this general order?

A. I don't recall one. 1:09:05
Q. I know that you worked at -- at Dixon. Are you familiar with how Dixon handles janitorial work in dayrooms?
A. Vaguely at the time. However, I left there in 2004 so their policies may have changed. I cannot comment --
Q. Sure.
A. -- how they do theirs now.
Q. Right. Did they -- who cleaned the dayrooms at Dixon?
A. Dayrooms were cleaned by pod workers, housing unit workers there, at that time that I was employed there.
Q. Do you recall any practice of -- of officers giving commissary items to detainees as a reward for help with a special project?
A. At times, there has been instances where people have been given extra as a -- a result of a task they completed.
Q. It wouldn't have been appropriate to give a detainee commissary items for performing their required duties outlined in this general order, right?
A. What -- what -- I didn't hear you the first part of it. What are you asking?

Q. It wouldn't be appropriate to give commissary items to detainees as a reward for performing their required duties in this general order, right?

A. Correct, required -- required duties didn't come with extra benefits.

MS. TRUESDALE: Okay. Let's take a break. We've been going for an hour and a quarter. So let's take a ten-minute break.

RECORDER: Okay.

MS. TRUESDALE: We don't have too much more to do. We'll try to be efficient. Let's come back at -- at 2:30, okay?

RECORDER: Okay. 1:11:23

MR. OWENS: Okay.

RECORDER: Off the record, 2:15 p.m.

(Off the record)

RECORDER: Back on the record, 2:31 p.m.

Q. Okay. Let's take a look at another document. This would be Exhibit 4, and it's labeled MCC2117 to MCC2157. At the top, it says, "McHenry County adult correctional facility, ICE detainee handbook." Do you see that, Officer Hermie?

A. Yes.

Q. Are you familiar with this document?

A. I am.

Q. And do you recognize it as the McHenry County Adult Correctional Facility, ICE Detainee Handbook?

A. This page, I recognize as that being -- yes.

Q. Okay. At the bottom, it says this was revised in January of 2011. Do you see that?

A. I see that. 1:12:35

Q. After this manual was revised, was it provided to all detainees at -- excuse me -- all ICE detainees upon entry to the jail?

A. Yes.

Q. And why does the jail give this ICE detainee manual or ICE detainee handbook to all the ICE detainees upon admission?

A. Because it's their ICE detainee handbook. That's why they need it.

Q. Right. And why -- what -- why is it important for them to receive a copy of it?

A. To outline everything that's contained in the ICE detainee handbook.

Q. Sorry. What did you say?

A. It's to outline everything that's in the ICE detainee handbook for that individual.

Q. Right. And why -- why is it important for each ICE detainee to be familiar with the contents of a handbook?

A. So they can be well-informed as to the information that's contained in there.
Q. Okay. This -- does this handbook set forth the rules for ICE detainees?
A. It sets forth much information that's contained in -- in that book. Whatever's contained in that book is what they're trying to convey to the ICE detainees.
Q. Uh-huh. Is some of the -- sorry. Okay. Is some of the information that's contained in the handbook rules?
A. I believe so, yes. 1:14:21
Q. And is some of the information disciplinary consequences for not following rules?
A. Yes.
Q. Okay. It's important for the ICE detainees to know what's expected of them, right?
A. Correct.
Q. When the ICE detainees would receive a copy of this handbook, they were required to sign a receipt acknowledging that they had received the handbook, correct?
A. Yes.
Q. And then that signature became part of the detainee's file, right?

A. Correct.
Q. Are you aware if this -- is this handbook was made available to detainees in any language besides English?
A. I believe in Spanish.
Q. Okay. Are you aware of any other languages?
A. I'm not aware of any other language than that.
Q. On page 1 of the handbook, which is MCC2121, in the third paragraph, it says, "A copy of this handbook will be available to each detainee, and certain sections are posted on the bulletin boards in each housing unit." Do you see that?
A. I see that.
Q. Do you recall this -- the -- certain sections of the handbook being posted on bulletin boards in each housing unit?
A. I vaguely remember, yes.
Q. Do you remember what sections those were?
A. I do not. 1:16:07
Q. Then it says, "All detainees will be held responsible for the handbook in your assigned cell. You are required to acknowledge, by signature, the receipt of the handbook. If you are unable to read, notify a staff member who will provide you with an

audio version of this handbook." Do you see that?
A. Yes.
Q. Did -- did each detainee possess a copy of the handbook in their cell?
A. Every detainee was issued one. The -- that part's correct.
Q. They -- were they -- they were issued the handbook upon admission, right?
A. Correct.
Q. And then they were responsible for keeping that copy over the course of their period of detention, right?
A. Yes, that's correct.
Q. Was it true that there was an audio version of the handbook available?
A. Well, I believe so, yes.
Q. Are you familiar at all with the process for reviewing and updating the handbook?
A. I vaguely have been part of certain questions as to updating it. Typically, that's an administrative responsibility.
Q. Which -- which subject matters -- would they come to you about updating the handbook with respect to certain subject matters?
A. No, they would not. 1:17:44

Q. Okay. What -- what kinds of -- were you asked to answer questions related to updating the handbook?

A. I was asked to read it and see if there's anything that I thought was necessary to alter or update.

Q. And do you recall how -- if the -- do you recall the handbook being updated in 2017?

A. I believe it was updated in 2017. I'm not exactly sure on the date.

Q. Okay. And between 2011, this version, and early 2022, do you recall any other times that the handbook was updated aside from 2017?

A. I -- I -- I don't recall.

Q. I'm turning to page 10 of the handbook, MCC2130. I want to focus on this last bullet point. It says, "Sections will be locked down from 1700 to 1800 daily so that dayrooms' floors may be cleaned and mopped. Responsibility for the cleaning of each dayroom will be the responsibility of everyone assigned to that area." Do you see that?

A. Yes. 1:19:05

Q. Was it accurate that the sections would be locked down from 1700 to 1800 hours every day?

A. Yes.

Q. And was it accurate that the purpose of that lockdown was for the dayroom floors to be cleaned and mopped?
A. Correct.
Q. And that task was performed by unpaid section workers, correct?
A. Correct.
Q. Turning to page 29 -- okay -- this is MCC2149. At the top of this page, it says, "voluntary work program." Do you see that?
A. Yes.
Q. Was that a "yes"?
A. Yes, I see that.
Q. Okay. And it says, "Detainees who are physically and medically able to work will be, upon availability, provided the opportunity to participate in a voluntary work program in the kitchen or as a laundry worker." Do you see that?
A. Yes, I see that. 1:20:21
Q. Okay. Is that accurate that the ICE detainees could work in the kitchen or in -- in laundry through the voluntary work program?
A. Correct.
Q. I think you had said earlier that ICE detainees could also be block workers. Does this jog

your recollection at all that ICE detainees were limited to working in the kitchen or as laundry workers?

A. To my recollection, they were allowed to also be block workers, as well, in their -- in their areas.

Q. Okay. And according to your recollection, that was over the full period of the ICE contract?

A. Yes, I believe so.

Q. Okay. Okay. This is labeled as Exhibit 30. This document doesn't have any Bates stamp because it's an -- it's an email produced in native format. Do you see the date at the top as March 17 of 2017?

A. That's what I'm reading.

Q. Okay. And this is -- is an email from Paul Veneziano to you and Tarrance Brooks, right?

A. Yes, it appears that [sic].

Q. At this time, would you and Paul Veneziano have both been the classification officers?

A. Correct. 1:22:12

Q. Below this email is an earlier email in the email chain. It's dated March 16 of 2017. Do you see that?

A. Yes.

Q. Is -- this email is from you, right?

A. Yes, it looks like it's from me.

Q. Okay. And it's to Tarrance Brooks and Paul Veneziano?

A. That's what I'm looking at, yes.

Q. Okay. You say, "Lieutenant Brooks, here" -- well, let me just let you take a look at this email so you can familiarize yourself with it. So just let me know when you want me to scroll down to the next page.

A. Okay. Go ahead. Okay.

Q. Okay. In -- in the -- sending this email, you are providing Tarrance Brooks and Paul Veneziano with a list of inmates for voluntary -- a work project, right?

A. Yes, it appears so. 1:23:39

Q. Okay. It -- it looks like there's a -- a painting project and a cleaning project, right?

A. Correct.

Q. And -- and then in the next email the next day, March 17 of 2017, Paul Veneziano was responding to your email, right?

A. It appears that that's what I'm reading, yes.

Q. Okay. And -- and he says, "There are some issues with the workers listed below. Most are not eligible for -- for work reason is listed next to name" [sic]. Do you see that?

A. I see that.

Q. He says, "I still believe that we should just use current, active workers that are on the payroll to paint. They are all medically cleared and qualified to work. It is hard enough to keep the kitchen jobs filled, let alone try to find an entire new crew to paint." Do you see that?

A. I see that, yes. 1:24:39

Q. Do you -- do you recall this situation of trying to find a crew to paint?

A. I don't recall this.

Q. Okay. When Paul Veneziano says, "It is hard enough to keep the kitchen jobs filled, let alone try to find an entire new crew to paint," do you have any recollection of it being hard to keep the kitchen jobs filled?

A. I don't have a recollection of that based on this email. I do not.

Q. Okay. In general in this period of time in 2017, were -- were the voluntary work program positions short-staffed?

A. They could be short-staffed from time to time. I don't know if they were short-staffed at that particular time.

Q. Okay. Let's take a look at another document. This is Exhibit 34. It's not Bates stamped. It's an

email with an email attachment. We're -- we're not going to focus on the -- the email portion of it, but you -- we're going to scroll down to the attachment. So we're on page 2 of this document. Are you -- have you ever seen this before?

A. I don't recall seeing this form before. I do not.

Q. Okay. Do you -- are you familiar with this -- this format?

A. I am not. 1:26:47

Q. Okay. Did you -- have you ever played a role in -- in any ICE inspection of the McHenry County Jail?

A. I assisted in gathering pictures for an immigration inspection but my role -- role there was very limited.

Q. Okay. Have you ever seen the ICE inspection reports that result from the ICE inspections of the jail?

A. I have not.

Q. Okay. Well, just for purposes of our conversation today, I will represent to you that this is an ICE -- ICE inspection report from 2016 and I just want to talk about one item in this report. So now, we're on page 56 of the report which is page 57 of the Exhibit and this section of the report -- do you see,

at the top, it -- it says, "Voluntary Work Program"?
A. Yes.
Q. Okay. And then about two-thirds down on the page, it says, "Voluntary work program reviewer summary." Do you see that?
A. Yes. 1:28:12
Q. Okay. It says, "ICE detainees have the opportunity to work and earn money by participating in the voluntary work program. ICE detainees are only authorized to work in the dietary department and receive a $3 a day [sic] for compensation." Did I read that correctly?
A. That -- if that's what it says on the sheet, yes, you read it correctly.
Q. Okay. Is -- does this match your recollection at all that the ICE detainees were only allowed to work in the dietary department?
A. To my knowledge, they were allowed to be block workers, as well, in their respective units.
Q. Okay. The classification officer -- who was the classification officer in 2016?
A. Classification officer in 2016 would have been Paul Veneziano.
Q. Did he have a -- a second classification officer at that time?

A. His second, at that time, would have been Sergeant Matthew Rotes, at that time.

Q. Okay. Okay. Let's pull up another document. This is going to be labeled Exhibit 37, and this one is Bates stamped MCC32 to MCC50. Are you familiar with this type of document?

A. I am familiar with this -- this format on an --

Q. Okay. 1:30:20

A. -- incident report, yes.

Q. Okay. What is this?

A. Excuse me?

Q. What -- what are we looking at?

A. We're looking at a McHenry County Office's [sic] corrections Incident report.

Q. Okay. I want to talk about one in particular. This is also McHenry County Sheriff's Office corrections incident report, right?

A. Correct.

Q. And what -- what does -- what's an incident report used for?

A. It's used for reporting incidences.

Q. Is there -- is there a different form you fill out if -- if discipline is going to be administered?

A. Yes, there are different forms.

Q. Okay. If -- on this particular incident report, it says -- here on the one, two, three, four, fifth line of this table -- it says, "Action taken, informational." Do you see that?

A. Yes.

Q. What does that mean?

A. It means the report is being written as a -- as an informational report.

Q. What would be -- if it weren't an informational report, what would be the other options?

A. There were several other options on -- on it. One is for disciplinary. Another for keep separate and -- and so on with a dropdown box.

Q. Okay. So informational -- if informational is selected, it means that discipline wasn't administered in this case?

A. Typically. 1:32:04

Q. Okay. So do you see, across the top, it says the date and time was December 5th of 2020 at 5:15?

A. Yes.

Q. And it says that the detainee/inmate was Basaru Asolo?

A. Yes, that's what it says on the report.

Q. And that the second detainee/inmate is Cesar

Elizarrarez -- I want to say?

A. It appears that way, yes.

Q. Okay. And then if we go down to the -- hang on a second -- the right one? Oh, I'm so sorry. I had you on the wrong one. Okay. We'll forget that one. We want to focus on this one, MCC37. Again, this is a McHenry County Sheriff's Office Corrections Incident Report, right?

A. Correct. 1:33:19

Q. And this one's dated December 22nd of 2022, right?

A. Correct.

Q. And the inmate listed is Basaru Asolo, right?

A. Correct.

Q. And like the last one where it says, "action taken," informational was selected out of the dropdown, right?

A. Correct.

Q. Okay. If we go down to the last line of this, like, written description here, it says, "Classification Officer Hermie and Sergeant Burke were notified of the situation." Do you see that?

A. I see that.

Q. So earlier, it -- in the section that's titled "Observations During Incident," it says, "On the

above date and approximate time, Detainee Asolo did not come and pass out trays. Earlier in the shift at approximately 5:15, Asolo wanted to come out and fill mop buckets. When he was told it was too early, he pushed the mop buckets back away from the door aggressively. Consistent through the month, he has been trying to fill up the mop buckets earlier and earlier." What -- do you know what the mop buckets are for?

A. The mop buckets are typically for mopping.

Q. Is this -- can you tell, by looking at this, whether this is unpaid section worker work?

A. I -- I cannot tell what that -- that means. I didn't write that report.

Q. Okay. Is there a reason why filling mop buckets -- by filling up mop buckets at 5:15 -- excuse me. That's not 5:15. I'm doing a bad job reading military time. That's 3:15 -- why that would be too early?

A. I'm unaware of -- of what the perception would be in this -- this incident report. My name is not listed on the bottom of it. I didn't write and I -- I -- I cannot comment on someone else's intentions or -- or their reasoning behind it.

Q. Uh-huh. Just, in your experience as a

corrections officer, classification officer, is there a reason why filling up mop buckets at 3:15 would be too early for -- for some reason?

A. There could, perhaps, be several reasons why. Something could have happened where they didn't want the inmates out doing the mop buckets in the hallway. That's happened to me in the -- in the past. This incident, though, I -- I don't know -- I can't -- I can't comment on something I don't know what it's about [sic]. Typically, mop buckets aren't filled until later on anyway. 3:15 is -- is pretty early for that. It's way before dinner.

Q. When are mop buckets typically filled?

A. I can't tell you what time they're filled up in these days. This is -- this report's back from 2020, so it could be different now.

Q. Well, when the ICE contract was going on, what -- what -- what time were mop buckets typically filled?

A. They were typically filled at cleaning time.

Q. Which was at 5:00?

A. Typically, yes. 1:36:46

Q. I -- I wonder if you could walk me through from the -- from -- well, so it -- the first thing I imagine that happens at cleaning time is that the --

well, before cleaning time starts, the section workers already know who they are for that day, right?
A. Correct.
Q. They've already been assigned, right?
A. Correct.
Q. So at 5:00 cleaning time, what's the first thing that happens?
A. I don't know what the first thing that happens, per se, every day, in every area. That's up to the officer's discretion and what routine that they and the detainees may have established.
Q. When you were a correctional officer -- well, let me ask you this, did you ever supervise cleaning time as a correctional officer for an ICE detainee section?
A. I did. 1:37:51
Q. Okay. Well, when you did it, what -- what was the first thing that would happen?
A. Typically, the several inmates that were out would start grabbing cleaning equipment. They'd start grabbing a broom. They'd start grabbing a mop. One individual would go out in the area and get a mop bucket, fill it up, get a mop.
Q. Excuse me. How many -- I think you said, "several inmates." Would it vary between -- would that

number of inmates vary -- or detainees rather? Let's focus on detainees right now. Would the number of detainees vary?

A. It could. It could go from -- it could go from two cleaning at -- at a time to -- to, say, four to -- to two cells depending on the availability --

Q. Okay.

A. -- and again, it's a -- and that's officer's discretion as well.

Q. How would the -- would the detainees work out amongst themselves who was going to go get the mop bucket, or who was going to, you know, do the sweeping or would the -- would you, as an officer, tell them, like, which duties each one was going to be in charge of?

A. Typically, the paid block workers would go out into the area and get the mop buckets that are required for the sections and then wheel them in. As far as other duties, we would give them the discretion to decide what tasks they wanted to participate in.

Q. So -- so sometimes, the section workers -- the unpaid section workers would -- well, when you say, "The -- the paid block workers would get the mop buckets," do you just mean they would drop off empty mop buckets for use by the section workers?

A. No, they would go to the closet that's out by the officer's control room and fill it up with water, with soap, and with a mop, and bring it to the section.
Q. Would the block workers enter the section with the mop bucket, or they would leave it outside the door?
A. They would typically just wheel it inside the door, and then they would go back out to the control area and finish picking up trays and cleaning up that area.
Q. Okay. Once the mop bucket filled with water and soap and the mop was inside the section, then -- then what would happen?
A. What do you mean, "then what would happen"?
Q. Would the -- would a section worker then take that mop and mop bucket and -- and mop the section floor?
A. Yeah, typically, after it was swept, they'd -- they'd mop it quick.
Q. Okay. So someone -- first, one of the unpaid section workers would sweep the floor. Then one of the unpaid section workers would mop the floor and -- and what else?
A. Common areas only as we outlined earlier.
Q. Okay. So -- so cleaning the showers, right?

A. In the showers, yes. 1:41:13
Q. Cleaning the toilet, right?
A. Yes, as we went over that before.
Q. And cleaning the sink, correct?
A. Correct.
Q. Okay. And I think you mentioned that usually -- that the unpaid section workers would also wipe down the tabletops, right?
A. Occasionally, yes.
Q. Okay. They always had to check the tabletops were clean, but if they were dirty, they would have to actually wipe them off, is that right?
A. Correct.
Q. Okay. Anything else that -- that you would make sure that the ICE detainees would do when you were supervising their cleaning time?
A. Again, as I said earlier, it would vary as needed.
Q. So there could be additional cleaning tasks depending on what was dirty in the dayroom, right?
A. Could be, but not -- not likely every day or all day or all week.
MS. TRUESDALE: Right. Okay. Okay. Let's just take a five-minute break. I -- I may have a couple more questions, but we're wrapping up. Can we

come back together at 3:07?

MR. OWENS: Seven? Why don't we go all the way to ten --

MS. TRUESDALE: You got it. Come back at --

MR. OWENS: All right.

MS. TRUESDALE: -- 3:10. Sounds good.

RECORDER: Off the record, 3:02 p.m.

(Off the record)

RECORDER: Back on the record, 3:11 p.m.

MS. TRUESDALE: We don't have any further questions. Thank you so much for your time, Officer Hermie.

WITNESS: Bye.

RECORDER: Okay. Signature?

MR. OWENS: No -- yeah, we'll reserve signature --

RECORDER: Okay. 1:43:31

MR. OWENS: -- and Margaret, are you ordering this one?

MS. TRUESDALE: Am I ordering the transcript? Do you want to go -- are we done being on the record? Did you need anything else, Brenda, while we're on the record?

RECORDER: One -- nope, that would be it. This deposition is concluded. Off the record, 3:11

p.m.

CERTIFICATION

I certify that the deponent was duly sworn by me and that the recording of the proceeding is a true record of the testimony given by the deponent or witness in the above-entitled matter.

Brenda L. Portillo

March 22, 2024

CERTIFICATION

I certify that the foregoing is a true and correct transcript from the recording of the proceedings in the above-entitled matter.

Laura R. Balluff

March 22, 2024