# EXHIBIT

# 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

-------------------------------------------------------

Aleksey Ruderman et al.,

Plaintiffs,

vs. Case Number 3:2022cv50115

McHenry County et al.,

Defendants.

-------------------------------------------------------

Deposition of Daniel Acevedo

Tuesday

March 5th, 2024

-at-

Zoom Remote Deposition

Exhibit 5

APPEARANCES

For the Plaintiffs:

Margaret Truesdale

Hughes Socol Piers Resnick & Dym, Ltd.

70 West Madison Street

Suite 4000

Chicago, Illinois 60602

For the Defendants:

Andrew G. Hamilton

Troy C. Owens

McHenry County State's Attorney

2200 North Seminary Avenue

Suite 150

Woodstock, Illinois 60098

RECORDER: Zoom is recording. Good afternoon. We are now on the record. Today is Tuesday, March 5th, 2024. The time is now 1:01 p.m. We are meeting remotely today for the deposition of Daniel Acevedo in the matter of Aleksey Ruderman et al. v. McHenry County et al., case number 3:2022cv50115. The venue is Northern District of Illinois, Western Division. Lieutenant Acevedo, my name is Robert

Alexis. I'm a notary public, recording this deposition remotely as a representative of Exhibit 5, LLC, which is doing business at 26 South Aberdeen Street, Suite 6, Chicago, Illinois 60607. This deposition is being recorded remotely via Zoom on behalf of Aleksey Ruderman et al. at the instance of Hughes -- of Hughes Socol Piers Resnick & Dym, Ltd. The deponent's identity has been confirmed off the record by satisfactory evidence, and he is physically located in the state of Illinois at this time. Lieutenant Acevedo, would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Okay. Thank you. Would the attorneys please state their appearance for the record?

MS. TRUESDALE: Margaret Truesdale for Plaintiffs.

MR. HAMILTON: Assistant State's Attorneys Andrew Hamilton and Troy Owens on behalf of the Defendant.

RECORDER: That completes the required information. We can now proceed.

EXAMINATION

BY MS. TRUESDALE:

Q. Good afternoon, Lieutenant Acevedo. I'm

Margaret Truesdale. I represent the Plaintiffs in this case, and I'll be asking you some questions this afternoon. Thank you for being here. Could you start by spelling your name for the video?

A. Last name Acevedo, A-c-e-v, as in Victor, e-d-o, first name Daniel, D-a-n-i-e-l.

Q. I'll just start by giving you some of the rules or -- of the road for depositions. Have you sat for a deposition before?

A. No. 0:02:24

Q. Okay. Well, right now, we're doing a video recording that will later be turned into a transcript. So for the eventual court reporter, it's important to give them the opportunity to be able to write everything down, and this is especially true over Zoom, that if we're talking over each other, it's not possible for the court reporter to be able to hear what two people are saying at one time, so for that reason, I would just ask that you wait until I'm fully finished stating my question before you provide your answer. And then two other things would be that, as you know, sometimes in regular conversation, we will say things like "mm-hmm," or we'll nod our head yes, or shake our head no, but because we're creating a record here, it's important to state verbal answers, "yes," "no,"

"correct," however you want to answer. And then the last thing is that if I say a question that you don't understand, I would just ask that you please let me know. Does that all make sense?

A. Yes.

Q. Okay. Great. What did you do to prepare for the deposition today?

A. Nothing. 0:03:39

Q. Okay. Did you meet with any lawyers to prepare?

A. First time I've been for this deposition was at 12:30 today.

Q. Okay. You met with lawyers at 12:30 today to talk about your deposition or prepare for your deposition?

A. My meeting time was to get here to get signed in by 12:30.

Q. Okay. And before today, you hadn't previously met with the attorneys in the room with you, Troy Owens or Andrew Hamilton, to discuss your deposition?

A. No.

Q. Okay. Did you look at any documents in preparation for today's deposition?

A. No.

Q. Okay. Are you currently employed by the McHenry County Sheriff's Office?
A. Yes.
Q. What is your title?
A. Lieutenant.
Q. Are you a shift lieutenant?
A. No.
Q. Are -- are you a -- what kind of lieutenant are you?
A. I'm in internal affairs.
Q. Okay. Does your current role relate to the McHenry County Jail?
A. My current role relates to the McHenry County Sheriff's Department.
Q. Yeah, I would just ask my question again. If you could provide an answer to the question that I asked you. Does your current role relate to the McHenry County Jail?
A. Yes, the entire sheriff department, which is part of the jail.
Q. Okay. How does your role relate to the jail?
A. Many different facets. I not only do internal investigations, I do background investigations, anything internal affairs related, whether it be hiring, recruitment, or internal

investigations.

Q. Does some of your internal affairs work relate to McHenry County Sheriff's Office departments that are not corrections related?

A. Yes. 0:05:54

Q. Okay. When did you start that role as lieutenant internal affairs?

A. Well, I think it was September of 2023.

Q. What role did you hold immediately preceding that one?

A. Prior to that, I was a lieutenant of the day shift in corrections.

Q. And how long did you -- or from what year to what year did you hold that position?

A. I don't recall dates. I don't know.

Q. Okay. Did you switch directly from lieutenant of day shift corrections to lieutenant internal affairs, or was there some gap in between those?

A. There was no gap. I went from the day shift lieutenant to internal affairs lieutenant.

Q. Okay. Do -- and do you remember around what year you started your role as day shift in corrections?

A. I want to say it was 2021 or '22.

Q. Okay. What role did you hold before that?

A. I was a lieutenant of the afternoon shift.

Q. In corrections?

A. Correct. 0:07:32

Q. And before that?

A. Before I was a lieutenant of the afternoon shift?

Q. Yes.

A. I was a -- for a very short time, I was a lieutenant of the midnight shift.

Q. And before that position, what position did you hold?

A. I was the administrative sergeant in charge of our special operations group.

Q. What does special operations do?

A. It -- it consists of a tactical team, an intelligence team, and negotiators.

Q. Does that group operate within the jail?

A. Yes.

Q. Does it also operate in the community?

A. No.

Q. Okay. Do you recall what years you had that position?

A. I do not.

Q. What -- what position did you hold before you were administrative sergeant special operations group?

A. I was a -- I think prior to that, I was the booking sergeant of the afternoon shift.
Q. Do you recall when you began that position?
A. I was promoted to sergeant in early 2011. I started off on the afternoon shift as a floor sergeant, and then got moved to the booking sergeant position maybe a year later.
Q. Okay.
A. I'm not sure. 0:09:34
Q. I understand. Okay. And before you were promoted to sergeant, were you an officer?
A. Yes.
Q. In the jail?
A. Yes, I'm a correctional officer.
Q. Did you begin your work as a correctional officer for the McHenry County Sheriff's Office in 2000?
A. Yes.
Q. Before you joined the McHenry County Sheriff's Office in 2000, did you hold any -- did you work for any other law enforcement agencies?
A. No, I did not.
Q. Was Nygren the sheriff when you joined the McHenry County Sheriff's Office?
A. I do believe so, yes.

Q. And then does it match your recollection that Bill Prim became the sheriff around the end of 2014?
A. That sounds correct. After Nygren was Sheriff Prim.
Q. Okay. In 2003, the County entered into a contract with the federal government to house ICE detainees, correct?
A. I'm not aware of the year.
Q. Okay. Are you aware that, at some point in the early 2000s, the County entered into a contract with the federal government to house ICE detainees?
A. Yes. 0:11:26
Q. Is that -- did that contract end at some point?
A. The contract -- the actual contract ended, but I don't know what year.
Q. Okay. Do you know when the McHenry County Jail stopped housing ICE detainees?
A. Yeah, as soon as Illinois passed the law.
Q. So when did they stop housing ICE detainees?
A. I don't recall dates.
Q. Does it match your recollection that it was in early 2022?
A. That sounds about right.
Q. Okay. During the period of that contract,

the McHenry County Sheriff's Office was required to keep the ICE detainees and the other inmates separate, right?

A. Correct.

Q. Do you know what the source of that requirement was? Like, who was requiring them to keep those -- those two groups separate?

A. That would be the federal contract that wanted them kept separate, so whoever was in charge of that, whether that be ICE or, you know, the feds.

Q. Okay. When you were a corrections -- corrections lieutenant, you -- part of your responsibility was maintaining a safe and sanitary facility, right?

A. Yes. 0:13:21

Q. And part of the reason for that is for the safety and well-being of your staff, right?

A. Yes.

Q. And part of the reason is for the safety and well-being of detainees, right?

A. Correct.

Q. Jails are congregate living facilities, right?

A. Yes.

Q. And because it's a congregate living

facility, sanitation is especially important, right?
A. Yes.
Q. There are some professional standards that relate to jail sanitation, right?
A. What standards are you talking about?
Q. Are you aware of any professional standards that apply to the McHenry County Jail that require a certain level of sanitation?
A. Are you referring to the Illinois County Jail Standards?
Q. Well, I'm asking you what you're aware of.
A. We know of Illinois County Jail Standards.
Q. Okay. If you don't maintain sanitary conditions in the jail, there can be some negative consequences, right?
A. Yes. 0:14:41
Q. Disease could spread, right?
A. Yes.
Q. The jail could fail an -- an inspection, right?
A. Yes.
Q. The jail could even get sued for maintaining unsanitary conditions, right?
A. Possibility, yes.
Q. So it's just not optional to have -- make

sure the facility is clean, right?

A. It -- it -- facilities need to be clean, correct.

Q. If -- if the McHenry County Jail couldn't rely on detainees to do the cleaning, it would have to hire some -- someone else to do it, right?

A. Correct, we hire other people to clean the facility.

Q. Could you tell me about that?

A. We have local custodians that clean -- clean our secured areas of our -- our facility.

Q. Did you say your security areas?

A. Our -- our secured facility, where inmates or detainees cannot go, we have custodians that clean.

Q. Aside from cleaning the areas of the facility where the inmates and detainees cannot go, do the custodians clean any other parts of the facility?

A. No. 0:16:16

Q. Are you aware of how detainee disciplinary records are stored at the jail?

A. I do believe so, yes.

Q. Are the -- how are they stored?

A. In a platform, I guess, called Inform Jail. It's our jail management record system.

Q. So they're stored in -- like, an electronic

version of them is stored?
A. Yes, we have electronic version, and then we have -- do have some paper versions. However, the majority is done electronically.
Q. Do you know, is Inform Jail -- well, have you -- do you ever -- have you ever heard the term "OCR"?
A. I have not.
Q. Okay. Do you -- do you know what it means to make a document word searchable?
A. No. 0:17:28
Q. Okay. In Inform Jail, are the -- are the disciplinary records stored by each detainee's file or by some other organization system?
A. You're going to have to ask that question again. I don't understand what you're asking me.
Q. So I think you had said that the disciplinary records are stored in a system called Inform Jail, and my question is, are the records in that system stored in connection with each detainee's name or some other organization system? Like, how are they organized?
A. Under each -- each person's name.
Q. Are they organized by subject matter?
A. No. 0:18:38
Q. What about by -- by offense number?
A. There are IR, incident report, numbers

attached to those that are incident reports.

Q. I'm not quite understanding that. Could you explain what you meant by that?

A. Yeah, you used the term "offense number."

Q. Yes.

A. An offense, something they did, all right? Incident is the same thing. It's just a different name. Incident report. The incident that we reported on.

Q. Right. I understand what an incident report is. So I guess my question was, are the disciplinary records organized by offense number?

A. We don't use anything called "offense numbers," so I'm going to say no.

Q. Okay. I've seen something where it'll say, like, you know, "minor number nine," for example. Have you seen that in the disciplinary records?

A. Yeah, you're talking about the majors and the minors in the rule book.

Q. Is -- would you call that -- I -- I'm calling that an offense number, but maybe you have a --

A. Okay.

Q. -- different term for it.

A. Right. But it's -- we -- we more categorize it under the incident number, so it -- the incident

that they get charged with a minor or a major offense, so but we're going to categorize that under an incident report number. So if it happened this year, it's going to be 24, being 2024, dash whatever the number is, so it could be 0001. That was the first incident report of 2024.

Q. Okay. But you're not familiar with any system of, like -- for instance, if you wanted to see all of the -- all of the disciplinary records that involved a minor number nine, could you locate all of those looking in Inform Jail?

A. No, not -- no, I -- I don't know of a way that I could just search every minor number nine and -- and get them all. I don't know of a way how to do that.

Q. Okay. How -- in the time that you were actually physically -- let me ask you another question. Currently, when you go to work, you're not working in the jail, right?

A. Currently, as of right now, no, not particularly. I -- my office is not in the jail.

Q. Okay. But when you used to -- when you used to report to the jail for work each day, how -- how common was it to have a major -- or how frequent were major violations?

A. How frequent were major violations? That's -- that's a hard question to ask because it just depends. You know, we have highs and lows. Some days, you know, you could get several. Other days, you would go zero.

Q. Would you have an estimate for how often you would have a major violation in a month, say?

A. I do not. 0:22:21

Q. Did the sheriff's office have general orders that applied to the operations at the jail?

A. Yes.

Q. And what -- what is a general order?

A. Basically our policies and procedures.

Q. There -- these general orders are officially promulgated by the sheriff, right?

A. Yes.

Q. Once the general order goes into effect, the jail staff is expected to know what's in the general order, right?

A. Yes.

Q. And jail staff is expected to follow the general order, right?

A. Yes.

Q. Was there any system in place to notify jail staff about the general orders to make sure they were

informed?

A. We have a system called PowerDMS that, when general orders get added or revised, that that pops in -- in the system, PowerDMS, and we log in and can read them and sign off on them.

Q. What -- would general orders and gaining familiarity with general orders be part of training when someone joined the McHenry County Sheriff's Office in the corrections area?

A. Yeah, yeah, you can consider that part of training.

Q. Pulling up a document. This is marked Exhibit 5, and it's Bates stamped, for the record, MCC14 to MCC16. Do you recognize this?

A. Well, it looks like one of our general orders.

Q. This general order, do you see at the top it's number GO-3.4.4-01?

A. Yeah, I see it. 0:25:08

Q. Okay. And it says it was issued in March -- March 30th of 2010?

A. Okay.

Q. And then where it says, "subject," it says, "facility housekeeping," do you see that?

A. I do.

Q. Do you recognize this as the McHenry County Sheriff's Office general order around facility housekeeping?
A. I recognize this as being a general order, yes.
Q. Are you familiar with this particular general order around facility housekeeping?
A. Not without reading it, and --
Q. Okay.
A. -- certainly not from --
Q. Well, I'm going to ask you about it, so let's take a minute for you to read it. Just let me know when you want me to scroll down, okay?
A. Okay. Scroll -- you can go a little bit more. Okay. Okay. Okay.
Q. Okay. Do you recognize this as the McHenry County Sheriff's Office general order around facility housekeeping?
A. Yes. 0:27:59
Q. And it says at the top it was issued March 30, 2010. Is it your understanding that this policy has been in effect since that date?
A. If this is what you're showing me, but is -- I don't know that there's an updated one or not.
Q. Okay. This policy applies to anyone who is

housed at the jail, right? Whether they're a state or federal detainee or inmate, right?

A. Under the definition, it says, "detainee/inmate workers," so I'm going to have to say yes.

Q. Let's focus on this part. It says -- it's Roman numeral four, and it says, "procedures." And then it says, "general housekeeping," and in paragraph one, it says, "The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and detainees/inmates," do you see that?

A. I did. 0:29:25

Q. It references a housekeeping and maintenance plan. Are you aware of any housekeeping and maintenance plan outside of this general order?

A. We have housekeepers and we have maintenance personnel, but I am not in charge of them, so I don't know what their procedures are.

Q. So when you say you have housekeepers, who are the housekeepers?

A. It's our custodian staff. They clean exactly what it said in there -- janitorial staff, excuse me,

to be more specific.

Q. Okay. I see. And then you said you had maintenance people, and -- and what --

A. Yes.

Q. -- type of work do they do?

A. They fix what basically needs fixing within their scope of responsibility.

Q. Okay. They don't do any cleaning?

A. Maintenance does not, no.

Q. Okay. At the end of this first paragraph, do you see in parentheses there's, like, this citation of some kind?

A. Yes. 0:30:37

Q. Are you familiar if that's -- are you aware if that is an ACA standard that they're citing?

A. I am not aware if that's an ACA standard or an ICE standard.

Q. Okay. In the next paragraph, it says, "The janitorial staff shall be responsible for the housekeeping and general upkeep of all public and staff restrooms, offices, staff elevators, visiting areas, staff locker rooms, staff dining areas, and any other areas where detainee/inmates are not permitted," do you see that?

A. Yes.

Q. That's what we talked about earlier, right, that janitorial staff is hired to clean areas where detainees and inmates are not permitted, right?

A. Correct.

Q. And when we talk about janitorial staff, we mean -- you mean people who are -- who are not detainees, right?

A. Correct. 0:31:45

Q. And they're not inmates, right?

A. Correct.

Q. They're -- they are people who, you know, from the community who are hired to work for wages, right?

A. They are hired employees, correct.

Q. Do you know how many members of the janitorial staff the jail would typically have at any given time?

A. Three. Barring sick time or benefit time, I -- I do believe there's three.

Q. Okay. I want to focus your attention on this part, Roman numeral three, where it says, "definitions," and then it says, "Section worker, detainee/inmate workers assigned to work only within their assigned housing unit/section -- section," did I read that correctly?

A. Yes.

Q. Is this how you understood section workers to be defined?

A. Yes. 0:33:00

Q. And section workers are different from voluntary work program workers, right?

A. I do not believe so.

Q. So is your understanding that a section worker -- are you aware of whether section workers are voluntary work program workers?

A. We have block workers that work in each individual block. We have kitchen workers that work the kitchen. We have laundry workers that work the laundry. Section workers, back at that time, I am not sure what that definition was in 2010.

Q. What about -- is your understanding that that term has changed in its use over the last ten years?

A. We use block workers that take the -- care of the whole block, meaning pushing in mop buckets, taking out mop buckets, assisting in passing out laundry, assisting in passing out meals sometimes, but they -- they run the whole block. I cannot recall the exact term of section worker back in 2010.

Q. Well, what would you use it to mean -- you -- you just don't use that term in present day?

A. I don't use that term.

Q. Okay. Is a block worker a voluntary work program worker?

A. They are -- yes, yeah, they want to do it to work, yes. They are -- they are -- they're -- they are not forced, if that's what you're asking.

Q. I want to move down to this subparagraph B, where it says, "detainee/inmate worker assignments," and then it says, "Detainee/inmate section workers shall be responsible for the general housekeeping of all common areas within each housing unit. This shall include the following areas," do you see that?

A. Yes. 0:35:42

Q. And then it lists, "all showers," "dayroom restrooms," "dayroom common areas," did I read that correctly?

A. Yes.

Q. These -- these items are performed -- I think you had said before that there's, like, workers who are forced to work, and then there's voluntary work program workers? I don't want to put words in your mouth.

A. That is incorrect. I've never said that.

Q. Okay. So you had said voluntary work program workers are not forced, right?

A. I never said that people were forced to work.

Please do not spin what I told you.

Q. Okay. You had said that voluntary work program workers are not forced, right?

A. Yeah, they're not forced to work.

Q. Okay.

A. But I never ever said somebody was forced to work --

Q. Okay.

A. -- for the record.

Q. That's fine. Okay. So these -- these responsibilities of the housekeeping of the showers, the dayroom restrooms, and the dayroom common areas, these are performed without compensation, right?

A. Dayroom restrooms -- to my knowledge, yes.

Q. So they're performed by section workers who are not voluntary work program workers, right?

A. They were performed by people that lived in that section.

Q. Right. And they were being performed not as part of some voluntary work program but as part of their requirements under this general order, right?

A. Part of their daily requirements. 0:37:30

Q. Okay. And then in subparagraph two, it says, "The following housekeeping procedures shall be for -- be performed in all housing units on a daily basis,"

and then it lists out, "collect all trash from all waste baskets throughout the housing unit," "clean all tabletops in the dayroom," "sweep all floors throughout the pod," "mop all areas swept," "spot clean all windows," "wipe down all telephones/video visitation stations," "dust all furniture, shelves, etcetera," "clean detainee/inmate showers," "clean dayroom restrooms," and "refill dispensers," do you see that?

A. I do. I do.

Q. The -- the section workers would be required to perform these duties not as part of any voluntary work program, correct?

A. Correct.

Q. And whoever was the assigned section worker for that day, they would have to do all of these things, right?

A. For the -- for the common area, correct.

Q. And all of these A through J, all of these items that are listed or all of these tasks, these are all tasks within the common area, right?

A. The only thing I question in my -- right now is "refill dispensers." There is no type of dispensers in the common area.

Q. Okay. Do you know what that means, "refill dispensers"?

A. The only thing I can think of possibly is in the hallway of each block, there is chemical dispensers, but that was not done by the block workers. But again, this is coming from 2010, but I do not recall ever any dispensers being in a common area.
Q. Would they be in the restrooms for soap?
A. No, not that I recall. 0:39:50
Q. Was there soap available in the restroom?
A. There were bars.
Q. Okay. But no, like, liquid soap dispensers to refill?
A. Not that I ever recall.
Q. Okay. Just moving back up again to 1A, it talks about cleaning all showers. How many showers would be in an ICE detainee housing unit?
A. Four.
Q. And how many restrooms were -- are -- were in an ICE detainee housing unit?
A. I want to say two, one on each side.
Q. And would those each have a sink in them?
A. Sink and a toilet.
Q. And cleaning -- cleaning a toilet would involve cleaning and sanitizing any urine, right?
A. Yeah, no different than at your house, yes.
Q. Right. And it would involve cleaning and

sanitizing any fecal matter that would be present, right?

A. Yes. 0:41:25

Q. Did -- did this -- the unpaid section workers wear any protective gear when cleaning the restrooms?

A. It was available to them. Did they wear it? I do -- I do not recall. It was available to them.

Q. Do you know what was available?

A. Gloves, to my recollection.

Q. Moving down the list to 2A, it talks about collecting all trash from all waste baskets throughout the -- the housing unit. How many waste baskets would that include?

A. There would be, to my recollection, one. 0:42:14

Q. And it says, "clean all tabletops in the dayroom." Do you know how many tabletops there -- there are in the dayroom of an ICE detainee housing unit?

A. Well, if we had 64 detainees in a section, four to a table, so I guess, without doing the math, I don't know.

Q. What about cleaning all the windows? Can you picture how many windows there would be that they would have to clean?

A. Not without being up there and counting.

Q. What about the -- the telephones/video visitation station? How many of those were there in an ICE detainee housing unit?
A. We had a lot of different housing units, but I want to say, in the ICE detainee, the big housing units, I do believe there are four phones.
Q. And is a phone -- were -- are there also video visitation stations?
A. Those would be different stations, and in the big sections, I do believe, to my recollection right now, without seeing the sections, four.
Q. And then it says, "dust all furniture shelves." What furniture would be present in an ICE detainee housing unit, aside from the tabletops we already talked about?
A. So you have your tabletops, you have your plastic chairs, one chair per person, you have a plastic bookshelf that held books and board games.
Q. Anything else? 0:44:18
A. Not without looking at the section back then. I don't recall.
Q. Moving on to this subparagraph C, "selection of section workers," this talks about, "Section workers shall be selected on a rotating basis based upon their cell assignment. Block/housing unit officers shall

develop a rotating schedule that has the detainees/inmates in each cell taking a daily turn being the section worker for their housing unit." Does that match with what the policy was when you were lieutenant corrections?

A. So yeah, rotating schedule of everybody that was in that housing unit.

Q. And again, these are the -- these are not -- this is not talking about voluntary work program workers. This is talking about unpaid required cleaning, right?

A. Everybody took turns at cleaning their area.

Q. But just to redirect you to my question, this isn't talking about voluntary work program workers, right?

A. We did not pay them, no. 0:45:52

Q. You didn't pay these section workers who were taking a daily turn to clean their housing unit, correct?

A. They took their turns, correct.

Q. Were officers supposed to keep a record of what cells or which detainees were assigned to perform these daily cleaning duties each day?

A. I do believe so, yes.

Q. Do you recall there being, like, a form with

blanks in it where the officers would write in the names of the detainees who were taking their turn for that day?

A. I don't recall what form they used. I don't recall that.

Q. Okay. Do you have any recollection of what happened to these records or if these records were maintained or stored anywhere?

A. Not to my recollection. I don't know.

Q. Okay. Are you aware of any instructions given to the block/housing unit officers about how to select detainee workers for daily cleaning outside of what's in this general order?

A. Can you be more specific on that? 0:47:45

Q. For example, are there any other policy documents outside -- beyond this general order that would give instructions to officers about how to assign the -- the daily cleaning duties to the --

A. Without searching the -- without searching the system, I do not know.

Q. Okay. This -- this section on selection of section workers, it doesn't talk about the frequency with which any individual detainee would be required to clean the housing unit, but given that people could only work in their own housing unit, does that mean

that the frequency of their cleaning duties would depend on how many people happened to be in that housing unit at a given time?
A. Yes. 0:49:02
Q. Jail personnel was expected to comply with this general order, correct?
A. Yes.
Q. Based on your experience and your recollection, were there any periods of time from 2010 until early 2022 when this order was not in effect?
A. I don't recall whether it was or it wasn't at that time.
Q. If an ICE detainee refused to perform their assigned cleaning duties as required by the general order, would that warrant discipline?
A. A failure to comply with an order would warrant discipline.
Q. So if a block officer told a detainee, like, "It's your turn today to perform these cleaning duties in the housing unit," and the detainee refused, would that warrant discipline?
A. The officer could write them up for failure to comply.
Q. And what does it mean to write -- write up a detainee?

A. Basically write an incident report, which we discussed earlier, and then, you know, probably I'm guessing it would be a minor ticket for failure to comply.

Q. And what would be the consequences? 0:51:02

A. Minor ticket go from anywhere from a verbal warning to a three-day lockdown.

Q. Did you ever see any detainee refuse to perform these cleaning duties when you were a corrections lieutenant?

A. None that I can speak of right now. I mean, I'm sure it happened, but none that I can recall.

Q. Are you aware of how other jails in Illinois handle janitorial duties in dayrooms or in housing units?

A. I -- I am not confident in how other jails perform their duties.

Q. Are you aware if there was ever any consideration at the McHenry County Sheriff's Office of having these duties outlined in this general order performed by voluntary work program workers as opposed to unpaid people?

A. I don't understand the question.

Q. Did -- let me know if you know if anyone at the McHenry County Sheriff's Office was considering

having these cleaning duties outlined in this general order performed by voluntary work program workers.

A. I don't know. 0:52:51

Q. Do you recall any practice of giving commissary items as a reward to detainees who helped with special projects?

A. I do believe it happened, yes, at times. I can't recall a specific incident.

Q. Okay. And that was -- but that was a reward for doing something special that was not required, right?

A. I -- you'd have to give me the exact incident. I don't know. I don't feel comfortable commenting on something that I don't know the specific incident of.

Q. Okay. Did you ever -- never mind. Scratch that. Okay. Let's move on to Exhibit 4. This is Bates stamped, for the record, MCC2117 to MCC2157. Do you recognize what this is?

A. It says it's McHenry County Adult Correctional Facility ICE Detainee Handbook.

Q. Do you -- are you familiar with this document?

A. Yeah. 0:54:10

Q. This one says it's revised of -- on January

1st, 2011, do you see that? Excuse me, it's not --
A. I do.
Q. It doesn't say, "January 1st." It says, "January of 2011," do you see that?
A. I do.
Q. Okay. Was this handbook provided to all ICE detainees upon entry to the facility?
A. As far as I recall, yes.
Q. Why was that the practice?
A. Why what?
Q. Why was this given to ICE detainees upon admission to the jail?
A. So they understood the rules.
Q. Was it also important for the ICE detainees to understand the disciplinary consequences for failing to follow the rules?
A. Yep.
Q. To ensure that all of the ICE detainees had access to the contents of this handbook, the jail required detainees to sign to confirm receipt of the handbook, right?
A. To my recollection, yes. 0:55:31
Q. And that signature was then made part of the detainee's file, right?
A. Correct.

Q. This handbook was also made available in Spanish, right?
A. Correct.
Q. Are you aware if it was made available in any other languages aside from English and Spanish?
A. I'm not aware of what languages, but I'm -- I'm not aware if it was Polish and Chinese. I cannot recall. I -- I recall those languages, but I don't recall if it was the -- for sure done in the handbook.
Q. If we scroll down to page 1 of the handbook, paragraph three, it says, "A copy of this handbook will be available to each detainee, and certain sections are posted on the bulletin boards in each housing unit. All detainees will be held responsible for the handbook in your assigned cell. You are required to acknowledge, by signature, the receipt of the handbook. If you are unable to read, notify a staff member who will provide you with an audio version of this handbook," do you see that?
A. I do. 0:56:59
Q. Was that -- was this policy carried out at the jail when you were a corrections lieutenant?
A. To my knowledge, if somebody asked for a different version, meaning they didn't speak whatever language they had that the handbook in front of you is,

then yes, they made some concessions.

Q. So they -- okay. Are you referring to the audio version of the handbook?

A. That was never my department. I do believe that our programs department would've handled that or our classification department would've handled that, but however, if they came and said that they did not read whatever language it was in front of them, every effort was made to make that possible --

Q. Okay. I understand. 0:58:03

A. -- to my knowledge.

Q. Okay. Are you -- are you aware if the -- this handbook was periodically reviewed and updated?

A. I don't know how often, but yes, it was periodically reviewed and updated.

Q. Okay. Turning to page 10 of the handbook, MCC2130, the -- I want to look at the last bullet point on page 10. It says, "Sections will be locked down from 1700 to 1800 daily so that dayrooms' floors may be cleaned and mopped. Responsibility for the cleaning of each dayroom will be the responsibility of everyone assigned to that area." Did I read that correctly?

A. Sure did. 0:58:58

Q. Was this the policy when you were corrections lieutenant?

A. Yes, between 5:00 and 6:00, after dinner, cleaning happened.

Q. This is page 29 of the handbook, MCC2149. Do you see at the top that this section talks about the voluntary work program?

A. Yep.

Q. And then it says, "Detainees who are physically and medically able to work will be, upon availability, provided the opportunity to participate in a voluntary work program in the kitchen or as a laundry worker," do you see that?

A. I do.

Q. Is it accurate that the ICE detainees, the only voluntary work program opportunities available to ICE detainees was in the kitchen or as a laundry worker?

A. To my knowledge -- to my knowledge, it was in the kitchen.

Q. Okay. Was there any -- so your memory is that the only voluntary work program opportunities available to ICE detainees was in the kitchen, right?

A. To my knowledge, they were allowed to work in the kitchen, yes. I don't -- I don't recall if they were allowed to work in the laundry room as ICE did not allow us to let them move amongst the building like the

laundry workers needed to.

Q. Outside of kitchen and laundry, were there any other work program opportunities that were available to ICE detainees?

A. Do believe they were allowed to be block workers, I do believe.

Q. Do you know why that's not reflected in the handbook?

A. I do not know why. 1:01:25

Q. Okay. Was that a more recent develop, or --

A. I don't recall the time.

Q. So if they -- if an ICE detainee was working as a block worker, what would their duties be when -- in the voluntary work program?

A. Block workers' duties would be to, every morning, give each section their cleaning supplies so that they can clean their cells in their sections. They would clean the hallway outside of each section after meal passes. They would supply the sections with the clean cleaning rags and remove the dirty rags. That's just basically what I remember at this time.

MS. TRUESDALE: Okay. Great. All right. We've been going for about an hour, so why don't we just take a five- or ten-minute break, and we can come back at 2:10. Does that work for everyone?

MR. HAMILTON: That's fine.
RECORDER: Off of the record, 2:03 p.m.
(Off the record)
RECORDER: Zoom is recording, 2:10 a.m. -- two -- 2:10 p.m, on the record.
Q. Okay. Let me share my screen. Lieutenant Acevedo, this -- we'll mark this Exhibit 31. This is an email. It doesn't have any Bates stamp numbering on it, but it is dated March 11, 2015. Do you see the date at the top?
A. Yes. 1:03:23
Q. And it's from Mike Lukas, do you see that?
A. Yes.
Q. And then you are among the recipients. There's a list of -- of recipients here, and your name is here, right?
A. Yes.
Q. Okay. And then the subject line of this email is "Illinois County Jail Standards," right?
A. Yes.
Q. There are a couple of attachments, "Illinois County Jail Standards 2014," "Illinois County Jail Standards 2014 Changes Highlighted," do you see that?
A. Yes.
Q. Okay. The body of the email says, "In

October 2014, the Illinois County Jail Standards were revised. Attached are two copies of the standards. One copy has all the changes highlighted, and the other copy is without -- the other is a copy without highlights," do you see that?

A. I see that, yes.

Q. You mentioned earlier the Illinois County Jail Standards. Are you familiar with those?

A. I am familiar with researching them when needed.

Q. When does that come up? 1:04:35

A. If -- if a situation arises and I need a question to an -- an answer to a question, I know that I can go there sometimes to get those questions answered.

Q. Do these -- is the McHenry County Jail required to satisfy these standards?

A. If you're asking are we required to follow the Illinois County Jail Standards, is that what you're asking?

Q. That's what I'm asking.

A. Yes. 1:05:10

Q. Okay. I'm going to pull up the attachment -- the first attachment, Illinois County Jail Standards 2014. Do you recognize this as being the -- looks like

the table of contents for the Illinois County Jail Standards?

A. No, I -- I see what I see here. Could I tell you for sure that that's the -- no, I can't.

Q. Okay. Let me go down to the specific standards we're going to be talking about. So I want to focus your attention on this part that says, "Section 701.120 Sanitation," do you see that?

A. I see it.

Q. Were you required, as part of your duties, to, when you were the -- one of the corrections lieutenants, to make sure that this sanitation portion of the Illinois County Jail Standards was met?

A. Sorry, I'm just reading. So was I in charge to make sure that this was -- was met? Is that your question?

Q. My question was if that was part of your duties to make sure that these sanitation requirements were satisfied.

A. As a lieutenant, yes, everything falls under us at times.

Q. Okay. Here, it says -- under "sanitation," it says, "general requirements," and then it has paragraph one that says, "Non-carpeted floor shall be swept and mopped with detergent or a germicidal agent

at least once daily," do you see that?

A. I do. 1:07:34

Q. Based on this, the McHenry County Sheriff's Office was required to have all floors swept and mopped every day, right?

A. Based on the --

MR. OWENS: Hold -- hold on. Objection. Asking him to make a legal conclusion. But go ahead and answer.

WITNESS: Go ahead and answer?

MR. OWENS: Yeah.

A. Based on the County Jail Standards, what it says, yes.

Q. Okay. Was that your understanding as well when you were a corrections lieutenant, that you were -- that the jail was required to make sure that the floors were swept and mopped every day?

MR. OWENS: Hold on. Same objection. Asked and answered. But go ahead -- legal conclusion. But go ahead.

A. The jail -- yes, the expectation was that the jail would be cleaned every day.

Q. And then just on the next page, it's still under this section on sanitation, there's a paragraph B1, and it says, "Toilets, washbasins, shower stalls,

and sinks shall be thoroughly cleaned and sanitized each day with detergent and a germicidal agent," do you see that?

A. I see it. 1:08:51

Q. Was the McHenry County Sheriff's Office required to make sure the toilets, washbasins, shower stalls, and sinks were cleaned and sanitized every day?

MR. OWENS: Objection. Asking him to draw a legal conclusion. Go ahead.

A. The detainees and inmates knew that the rules were they were to clean their cells every day. If you're asking me if they did that every day in their cells, I cannot answer that question.

Q. Well, what about outside of their cells in the dayroom?

A. Again, they knew that they -- it was their turn to clean their dayroom. Now, did they clean the toilets? I cannot answer that. I was not in there.

Q. Okay. Great. My question was a little different. I'm just asking you that you said that these standards apply to the jail, right?

A. The County Jail Standards, Illinois County Jail Standards, correct, yes.

Q. And they apply to the McHenry County Jail, right? 1:09:58

A. Yes, we are governed by the Illinois County Jail Standards, correct.

Q. Right. So this particular standard says that toilets, washbasins, shower stalls, and sinks must be cleaned thoroughly and sanitized every day, and so my question is, was the McHenry County Sheriff's Office required to make sure that the toilets, washbasins, shower stalls, and sinks were cleaned thoroughly and sanitized every day?

MR. OWENS: Objection. Asking him to draw a legal conclusion. Go ahead and answer.

A. The officers were -- were in charge to make sure that -- that toilets, floors, tables were cleaned every day.

Q. If -- if the jail didn't comply with these Illinois County Jail Standards, what could happen?

A. I don't know. 1:10:56

Q. Okay. Did you ever have that experience as a corrections lieutenant, that you were out of compliance with any of these standards?

A. Not to my knowledge.

Q. Okay. I'm going to turn to Exhibit 32. This doesn't have any Bates stamps. It's an email. It's dated August 30th of 2022. Do you see the date at the top?

A. August 30th, 2012?

Q. Oh, I misspoke, yeah. Thank you so much. August 30th of 2012. Thank you for the correction.

A. This email is from Rebecca -- well, let me actually start -- let me start -- so this is an email chain. It's six pages, as you can see, and so I'm going to go down the chain and start with the most -- with the oldest email and work my way back to the most recent one so we have the context. So this is the first email in the chain. It's dated August 27, 2012, do you see that?

A. August 27th, 2012, I do.

Q. Okay. And this -- this one doesn't copy you, but you will be on a later one, so just sit tight. So this says -- this is talking -- I'll -- I'll read it to you. It says, "As you're aware, Officer Gebauer reported on July 15, 2012 he feel," I think they mean fell, "he feel," fell, "attempting to sit on a stool, falling, causing multiple injuries. He went to the ER that resulted in x-rays to his right wrist, right shoulder, right knee, right ankle, neck, and back. All x-rays were negative. According to protocol, he followed up the next business day, 05/17/12, with occupation medicine. At that appointment, Officer Gebauer explained the incident o (sic) the occupational

medicine M.D., stating that," quote, "'On July 15, 2012, performing inmate check, floor wet after being mopped. Put his right foot on bar of rolling stool, stool shot from under him, landing on his back. Continued falling backward, striking back on concrete floor,'" end quote, do you see that?

A. I see it. 1:13:35

Q. Do you have any memory of this incident?

A. No.

Q. Okay. And then if we go down in the email, it says, "This statement is now part of his medical record. However, nothing was noted in the ER or his written report about wet flooring. Please investigation (sic) the possibility of wet flooring. Here are a few questions to get the investigation," quote, "'juices,'" unquote, "flowing." And then there's a list of five questions, do you see that?

A. I see it.

Q. Okay. And question number one says, "Is there a schedule were," and I think they mean where, "inmate workers mop flooring?" Do you see that?

A. I see it.

Q. Okay. We're going to go to the next email. Oops. This email was sent to you, right? This is August 27, 2012 at 1:10 p.m., do you see that?

A. I see it.
Q. And it's from Rebecca Sylvester, right?
A. I see it. 1:14:47
Q. And it's to you, correct?
A. Correct.
Q. And Ms. Sylvester has copied Daniel Sitkie, correct?
A. Sure looks that way.
Q. Okay. And it's addressed to you. It says, "Sergeant Acevedo," was -- were you a sergeant at that time?
A. That's what it says.
Q. Is that your recollection, that in 2012 you were --
A. Yes.
Q. -- still a sergeant?
A. Yes.
Q. Okay. And then it says, "Please answer the following questions that Bev Beyer has regarding Officer Gebauer's chair fall on July 15, 2012," do you see that?
A. I see it.
Q. Okay. So then you respond to the email. This email is dated August 27, 2012, and it's from you, right?

A. From -- yes.

Q. Okay. And you -- you wrote it to this Bev Beyer, right?

A. Bev Beyer, correct.

Q. Beyer, excuse me. And you copied, among other people, Daniel Sitkie and Dan Sedlock, right?

A. Correct. 1:15:59

Q. Okay. And you said, "Hello. I will answer your questions to the best of my memory. One, yes, the sections are locked down every afternoon from 700 to 1800 hours for cleaning. During this time, the section floor does get mopped," do you see that part?

A. I see it.

MR. OWENS: I'm not objecting, but I want to make sure that you didn't misspeak. Did you say, "700" or "1700"?

MS. TRUESDALE: Oh, I -- I meant to say, "1700," but I can go back and correct the record. Thanks, Troy.

MR. OWENS: That's -- thank you.

Q. "Yes, the sections are" -- the -- so the email says, just so the record is clear, "Yes, the sections are locked down every afternoon from 1700 to 1800 hours for cleaning. During this time, the section floor does get mopped," do you see that?

A. "During this -- floor" -- yes.

Q. And it's the -- it's the section workers that are mopping the section floor from 5:00 to 6:00, correct?

A. I don't recall. 1:17:11

Q. Okay. In your experience, does the section floor get mopped every day from 5:00 p.m. to 6:00 p.m.?

A. Yes, from the people that live in that section.

Q. What do you call those people?

A. Detainees.

Q. Okay. Did the general order refer to those people as section workers?

A. I do not recall.

Q. Okay. Okay. Then the -- then there's two more emails here. Okay. Here's an email from the same chain. This one is dated August 30th of 2012. Do you see that date?

A. I see the date.

Q. It's from Rebecca Sylvester, right?

A. That's what it says.

Q. And -- okay. She says -- this is to Bev Beyer, right?

A. It's to Bev, so I'm assuming that to Bev Beyer, yep.

Q. Okay. Okay. So it says, "Bev, the last date available to view video is August 12, 2012. I selected and viewed video for August 12th and August 29th." When she says, "view video," is there a video recording of the -- of the housing units?

A. What -- what year was that again?

Q. August 12th, 2012.

A. To my recollection, there was limited video, yes.

Q. Okay. And she says, "On both dates, the section was locked down at approximately 1645 hours, and the section's detainee workers mopped the floor," do you see that?

A. "And the section's detainee workers" -- yes.

Q. Okay. So was that the common practice, for this section's detainee workers to mop the floor from about 5:00 to about 6:00 in each --

A. To my recollection, the detainees mopped the floor after dinner, yes.

Q. These are not block workers, right?

A. Not to my -- not to my recollection, no.

Q. Is that -- is that -- you're saying that, according to your recollection, that's correct?

A. That's what I just told you.

Q. Okay. 1:20:08

A. To my recollection, no, they're not block workers.

Q. Okay. So meaning they're not voluntary work program workers, correct?

A. They're detainees that live in the section. I don't know whether they volunteered to mop that day or not. I cannot answer that question.

Q. Okay. But they're not being compensated?

A. To my recollection, no.

Q. Okay. And they're not performing that cleaning as part of a voluntary work program opportunity, correct?

A. I don't know if they're volunteering to do it. 1:20:43

Q. Well, I guess there's two different things, right? One would be if a person volunteered to do something, and another thing would be if a person was doing something according to a voluntary work program job. Do you agree with that?

A. No, I agree that if they want to get out and stay out of their cell and not be locked down because they can mop a floor, that's a voluntary -- that's -- that's voluntary, and that -- that has happened where, "I don't want to go lock down for that hour. I want to stay out, and I want to mop." That is a voluntary

program.

Q. But is that part of the jail's official voluntary work program where -- like, would that detainee then receive $3?

A. I don't recall if they would've received money or not.

Q. Have you ever seen someone say, "I would like to perform the required cleaning duties in the dayroom today," and then see someone give them $3 as compensation for that?

A. I don't recall. I did not deal with the money or the compensation, so I could -- I can't answer that.

Q. Well, what makes someone part of the voluntary work program?

A. Classification would hire workers. I don't like the word "voluntary" in front of it, but classification would hire our workers. But if they're volunteering to clean or mop a section, that's just that. They volunteered to stay out, and -- try not to overthink this. If I volunteer to vacuum this carpet right now, I'm volunteering to it. I'm not getting hired to do it.

Q. Right. Exactly. So if you volunteer to vacuum a carpet in your housing unit, that wouldn't

make you into a voluntary work program worker entitled to $3 a day, would it?
A. No, I'd have to say no. To my -- to my knowledge, no.
Q. Right. You would have to be hired to be part of the voluntary work program to be a voluntary work program worker, right?
A. There was a process to hire inmate worker or detainee workers, correct.
Q. Okay. And detainees cleaning their housing units on a rotating daily basis were not doing it as part of the voluntary work program, right?
A. They were not hired, no.
Q. Okay. Let's flip to Exhibit 11. This one doesn't have a Bates stamp either, but it -- it's an email, and it's dated January 26 of 2013. Lieutenant Acevedo, do you see the date at the top of the email?
A. I see it. 1:23:43
Q. This email -- well, you're copied on the -- the bottom email, so let's start with that one. That is the oldest email. That one is dated January 23, 2013, do you see that one?
A. January 23rd, 2013, I do.
Q. Okay. And this one is from Frank Males, right?

A. Correct.

Q. And it's sent to Daniel Sitkie and you, right?

A. Correct.

Q. This email says, "I would like to begin a cleaning schedule for the second floor. I have already told the block officers in block two and three to make up a schedule. In light of recent events in two to three, it seems that there are those detainees that think they are above this detail, and it eventually causes all to refuse." I'll stop there. Do you see that part of it?

A. I see it.

Q. Okay. It says -- where it says, "In light of recent events in two to three," do you know what those recent events are?

A. I do not. 1:24:58

Q. Okay. And then where it says, "There are those detainees that think they are above this detail, and it eventually causes all to refuse," I want to ask you about that. Is it your experience that, if certain detainees are not required to perform their cleaning duties, that it could cause other detainees to refuse as well?

A. I can't answer that. I don't recall any

specifics.

Q. What do you take this email to mean where it says, "There are those detainees that think they are above this detail, and it eventually causes all to refuse"?

A. I don't know.

Q. Then it says, "This system seems to work on the third floor and was in place in years past on the second," do you see that part?

A. Yep.

Q. The third floor was where the ICE detainees were kept, or housed rather, right?

A. Yes, at times, yes, for the most part.

Q. Were they -- were the ICE detainees housed in other locations at other times?

A. At times, they went down to the second floor depending on space.

Q. Okay. So if there were so many ICE detainees that they needed more space than just on the third floor, then sort of the overflow would go to the second floor?

A. At times, yes. 1:26:32

Q. Okay. So this -- does this match your recollection of this time period at the -- at the jail that the ICE detainees on the third floor were subject

to a cleaning schedule?
A. I don't recall what schedule they were subject to, if any.
Q. Okay. Then the next sentence says, "I believe this is the fairest way to ensure that all detainees assist in their sanitation responsibilities. I just need your help in reminding the officers to utilize the schedule and write up those that refuse," do you see that part?
A. I see it.
Q. So Frank Males, he sent this email to you, so he was asking for your help in reminding the officers to utilize a cleaning schedule and write up those who refuse, right?
A. The way it's read -- the way it's written, yes. I don't recall --
Q. Do you --
A. -- this email.
Q. Do you recall providing any help to remind the officers to utilize a cleaning schedule and -- and write up detainees who refused to clean?
A. No. 1:28:01
Q. Then the next email is from Daniel Sitkie to Frank Males on January 24, 2013, do you see that part?
A. I see it.

Q. Okay. He says, "I agree, and you are now in charge. Set it up for afternoon shift. I want you to explain it to the inmates with a notice and put a date, in the future, when it starts. Explain to them on the notice that if they refuse, they will be locked down for three days and then asked again the next day to make up for the day refused, and they will get another three days if refused again." I'll stop there. Does that --
A. Okay.
Q. What Daniel Sitkie is saying, does that match with your recollection of -- of how the detainee cleaning was managed?
A. I don't recall how that was done. This does not -- I do not remember any of this.
Q. Okay. Then it says that, "This procedure will repeat itself until they get three write-ups, at which time they will be given a major ticket and could receive another 15 days of seg time," do you see that part?
A. I see it. 1:29:24
Q. Does that match up with your recollection of how detainee refusal to clean was handled?
A. No, and I never even received this email, so I don't remember any of this.

Q. Okay. Then Sitkie says, "That should solve the refusal problems," do you see that part?
A. I see it.
Q. Discipline is used to -- as a deterrent for rule violations, right?
A. Yeah, discipline is used as a deterrent to, yeah, rule violations and used as a learning tool.
Q. How is it used as a learning tool?
A. Kind of like discipline at work, you know. It's not meant to be a bad thing. It's meant to help you -- help you learn from your mistakes.
Q. So if a detainee were to receive a three day lockdown for refusing to clean, what would be the learning experience for them?
A. They would receive a lockdown for failure to comply. Then their learning experience is they need to comply with all orders.
Q. Okay. The next email is from Frank Males in response to Daniel Sitkie, dated January 26 of 2013, do you see that one?
A. I see it. 1:30:59
Q. Okay. It says, "This was implemented last week with the full support of my partners. Way ahead of you, boss," do you see that?
A. I see it.

Q. What -- do you know, like, what this means, "the full support of my partners"?
A. I do not. I did not write it.
Q. Okay. Are you -- who -- is that -- well, what was Frank Males' role? Could you remind me?
A. I do believe was probably a sergeant at that time.
Q. Okay. Is there -- is a -- is partners, like, a term that's used at all in the jail context?
A. Any sergeants could be used as partners.
Q. So like, if you're a sergeant, your partners are other sergeants, is that right?
A. Yeah, it could be used as -- as that, yeah.
Q. Okay. Okay. Okay. Let me pull up another document. This is Exhibit 36. It's Bates stamped MCC4013 to 4104. Does -- does this -- does this -- does this document format look familiar to you?
A. Yes. 1:32:17
Q. Okay. What do you recognize this to be?
A. Just what it says, the segregation status notification.
Q. Okay. I'm going to focus on one particular one, one particular disciplinary record in this -- in this PDF. So I'm on page 51 of the PDF, Bates stamp page MCC4063. This is a disciplinary committee hearing

report, right?
A. Mm-hmm.
Q. Could you give me a yes or no? Sorry about that, but it's --
A. I'm sorry, yes.
Q. Okay. What is a disciplinary committee hearing report?
A. This is basically if they receive a major rule violation, they get to be -- they get to discuss it with the -- with the committee, with the disciplinary committee, and then the disciplinary committee will make their recommendations on whether it's sustained, not sustained, dismissed.
Q. Okay. Who ultimately determines what the level of discipline is going to be?
A. Who -- who's ever in charge of that at the time.
Q. When you --
A. But ultimately, it goes by the chief or his designee who makes the final approval.
Q. The chief or his designee, you said?
A. Yes, the chief --
Q. Okay.
A. -- or his designee.
Q. Okay. But the committee -- what about the

disciplinary committee? Did they have a role in deciding that?

A. The board only has a role in the recommendation of sustained, not sustained, dismissed.

Q. I understand. Okay. So this -- this is a disciplinary committee hearing report for the detainee/inmate, and the name is Angyal, Aniko, do you see that at the top?

A. I see it. 1:34:44

Q. Okay. And then the date is August 31st of 2018, right?

A. Yep.

Q. Okay. Then it says, "major number," do you see where I'm pointing?

A. I see it.

Q. Okay. And it says, "25, habitual violations of minor offenses. Three minor violations within a 30-day period," do you see that?

A. I see it.

Q. Then if we scroll down, is this your signature here on the bottom?

A. Yes.

Q. Okay. And you -- you're signing this form, and the form says, "I have reviewed the board's findings, and I am recommending the following due to

their findings, found sustained, recommend three days of disciplinary segregation," correct?

A. Yes.

Q. Okay. And then you checked the box for "SMU," right?

A. Yes.

Q. So what does that mean?

A. SMU stands for special management unit.

Q. What is the -- and I see that the other option is "assigned cell," right?

A. Correct. 1:36:02

Q. So what's the difference between disciplinary segregation in SMU versus disciplinary -- disciplinary segregation in assigned cell?

A. They are just separated. They go to a different section is the only difference.

Q. If you're in disciplinary segregation in your assigned cell, is your cellmate there?

A. Yes, it could be.

Q. Okay. But if you're in disciplinary segregation in SMU, are you alone?

A. You're -- you're housed by yourself, correct.

Q. Okay. Would you -- is disciplinary segregation in an assigned cell, is -- could that sometimes be referred to as lockdown, or am I confusing

those things?

A. You're -- you're -- both those, you're locked down. Like, the minor violations are in your assigned cells. The -- the major violations just depends, can be in SMU or your assigned cell.

Q. Okay.

A. But you're -- you're locked down for 23 and one.

Q. Okay. I want to keep going with this -- this -- these records around Aniko Angyal in August of 2018. So there's another -- there -- there's several pages of records associated with this particular incident. This -- this page says -- this is the McHenry County Adult Correctional Facility disciplinary report, right?

A. Yes. 1:37:57

Q. And -- and again, this is for this Aniko Angyal, right?

A. That's his name, yes.

Q. And it's dated August 29, 2018, right?

A. Yep.

Q. Okay. Do you have a recollection of this person?

A. No.

Q. Okay. And then when -- where -- where it says, "observation," do you see that part?

A. I see it.

Q. It says, "Detainee Angyal is in violation of minor number nine, four, and two, which constitutes a major" -- excuse me, "which constitutes a valid major number 25 violation." Did I read that correctly?

A. Yes.

Q. Okay. So if we keep going down in this person's record, then it -- it provides the incident reports for each of those three minor offenses that collectively constituted a major offense. So this is the first one, this is minor number nine, do you see that part?

A. See it.

Q. Okay. And then this is the second one, and this is minor number four, do you see that?

A. I see it.

Q. Okay. So I just want to talk about this one for a moment. We're on page MCC4066. This says, "On the above date and approximate, I, Officer Manoli, was assigned to block three. While conducting the seven hundred -- 1700-hour clock, I informed Detainee Angyal that it was her turn to clean the dayroom and that she needs to be out cleaning with the other detainees. She replied," quote, "'I am not cleaning,'" end quote. "I asked why, and Angyal replied," quote, "'Because I

don't want to,'" end quote. "I informed Angyal that she would be receiving a three-day lockdown for not performing the daily cleaning duties." And then further down -- did you -- do you see that part?

A. I see it. 1:40:06

Q. Okay. And then farther down, it says, "Detainee Angyal will be receiving a minor number four, failure to perform routine cleaning duties," parentheses, "cleaning floors, walls, sinks, toilets, empty wastepaper baskets, or making your bed," closed parentheses, do you see that part?

A. I see it.

Q. So this refusal to clean, when combined with the other two violations, amounted to a major violation, right?

A. Yep, if they got three minors in a 30-day period.

Q. And in this particular case with Detainee Angyal, that's what happened, right?

A. According to the paperwork. 1:41:01

Q. Okay. And you -- you signed it, right? We saw your signature above, correct?

A. Yep, saw my signature.

Q. Okay. And then those -- those three minor violations, but together constituted a major violation,

you determined here, on MCC4063, that those warranted three days of disciplinary segregation in SMU, correct?

A. Correct.

Q. Okay. And when you did so, you were acting according to the jail's policy, right?

A. Correct.

Q. Okay. I just have a few more questions. One -- we talked a little bit about the different forms of discipline that are -- that are available and utilized at the jail. One of those is the 23-hour cell restriction, right?

A. A one-day lockdown? Yes. 23 and one is what you're saying?

Q. Yeah, so a 23 and one, it could last up to three days, right?

A. You can get locked down in your own section for up to three days, yes.

Q. Okay. And would -- would you call that, like, three days of 23 and one, or how would you describe that?

A. Three-day lockdown. 1:42:39

Q. Three-day lockdown. Okay. And when a person is in three-day lockdown, they're in their own cell, right?

A. Yes.

Q. And they -- are they -- they're sometimes locked down -- well, let me scratch that. How -- how big was the cell that they would be held in for those 23 hours a day?

A. I don't have measurements.

Q. Okay. What was -- what was -- what was the type of door to that cell?

A. Be more specific, please.

Q. Like, was it a metal door with a window, or was it more like bars?

A. Window, metal door with window.

Q. So if the person is in a twenty -- in a lockdown, they would be able to see out that window, but otherwise would not have a visibility to the space outside of their cell, correct?

A. To face outside their cell?

Q. To be able to see outside of their cell, the only visibility to outside of their cell would be looking through that window, right?

A. Wrong. 1:44:06

Q. Okay. Is there another area where they could view the space outside of their cell?

A. They can look out the window to see the outside of the facility, or they can look out the door window to see inside the dayroom.

Q. Okay. So in the cell, there's two windows. One is to the outdoors, and one is to the dayroom, is that right?

A. Correct.

Q. Okay. In the SMU, are there -- are there windows to the outside -- to the outdoors as well?

A. Yes.

Q. And there typically would be two people in the cell if a person was locking down in their own cell, right?

A. It'd just depend on if they had a cellmate at the time or not.

Q. Right. And they're -- they don't -- they wouldn't necessarily get along with their cellmate, right?

A. Don't know how to answer that one. If they didn't get along, they would notify an officer. So I -- I can only assume that if they're in a cell together, they're getting along.

Q. But they may not like their cellmate's personality, right?

A. I -- I -- I don't know.

Q. Okay. For the 23 hours that they're in their cell, they don't have access to the dayroom, right?

A. Wrong. 1:45:54

Q. Okay. Are they able to access the dayroom during those 23 hours where they're confined to their cell?

A. Oh, for the 23 hours, I misunderstood you. They're out one hour a day. Plus, they get to get out for laundry, they get to get out to pick up their meals, and they get to get out to take their medicine, if they're taking medicine.

Q. Could you explain what you mean when you say that they -- they can leave for laundry?

A. If they -- if there's laundry pass, they can go and exchange their laundry.

Q. Okay. And when they can leave for meals, do they -- do they eat their meals outside of their cell, or do they pick their meals up and then eat them inside of the cell?

A. They would eat their meals inside their cell.

Q. Okay. So when they -- you say that they can get out for meals, it's the -- it's the process of picking the food up that they can leave --

A. Correct.

Q. -- for, and then they bring it back, right?

A. Correct.

Q. And when they eat their meals in their cell, that's the same cell where they -- they also have a

toilet in there, right?

A. Yep, they have a toilet in the cell, yes.

Q. And that toilet is for shared use, for their use and for their cellmate's use, right?

A. If they have a cellmate, yes. 1:47:19

Q. That -- the one hour that they're out is their only opportunity to shower, right?

A. Correct. They are to take the shower, make their phone calls in that hour, yes. Clean their cell. It's actually an hour and 15 minutes, but yes.

Q. Right. The 15 minutes is supposed to be to clean your cell, and then if you sort of get done, then you're allowed to leave, is that right?

A. Right. They get an hour and 15 minutes to shower, clean their cells, make any phone calls they need to make, correct.

Q. And that one hour outside of their cell, that's also the only opportunity to access any recreation, right?

A. Correct.

Q. The -- having the lockdown as a -- as a possible discipline has a deterrent effect on people who might consider breaking a rule, right?

A. Ask that again, please?

Q. Does having lockdown as a potential form of

discipline have a deterrent effect on people who might consider breaking a rule?

A. It could. Depends on the person.

Q. Is that part of the purpose of it?

A. Deterrents? That is part of it, yes.

Q. Okay. Shannon -- are you familiar with Shannon Hermie?

A. I am familiar with Officer Shannon Hermie, yes.

Q. How long have you worked together?

A. I don't know. 1:49:41

Q. Do you know what Officer Shannon Hermie's role is currently?

A. Classification officer.

Q. What is a classification officer's duties?

A. I don't know it intricately, but they -- they classify the inmates, decide what section they can safely reside in depending on the individual's background and medical and --

Q. So they give them their --

A. -- other factors.

Q. I'm sorry, I didn't mean to cut you off. Okay.

A. Yep.

Q. Do they give them a security --

A. As well as other --

Q. -- classification? The -- the classification officer gives them their security classification?

A. They -- they fill out a certain sheet, and that -- that kind of helps them guide what section they should reside in.

Q. Okay. Do you know if Officer Hermie has held any other positions with McHenry County Sheriff's Office aside from classification officer?

A. I don't recall. 1:50:56

MS. TRUESDALE: Okay. All right. Let's just take a five-minute break. I'll just check my notes and make sure I don't have anything else, okay? So why don't we --

RECORDER: Off the record --

MS. TRUESDALE: -- come back together at 3:05?

RECORDER: Off --

MR. HAMILTON: Sounds good.

RECORDER: Oh. Off of the record, two -- 2:59 p.m.

(Off the record)

RECORDER: On the record, 3:05 p.m.

MS. TRUESDALE: I don't have any further questions. Thank you for making yourself available

today, Lieutenant Acevedo, for your time.

MR. OWENS: Okay. We'll -- we'll reserve signature.

RECORDER: Okay. Reserve. Okay. Let's go ahead -- shall we go off the record then?

MR. OWENS: Yeah.

RECORDER: Okay.

MS. TRUESDALE: Yeah. Thank you, Bob.

RECORDER: Okay. Off --

CERTIFICATION

I certify that the deponent was duly sworn by me and that the recording of the proceeding is a true record of the testimony given by the deponent or witness in the above-entitled matter.

Robert Alexis

April 22, 2024

CERTIFICATION

I certify that the foregoing is a true and correct transcript from the recording of the proceedings in the above-entitled matter.

Brittany Wolin

April 22, 2024